# CHARLESTON.

CITY OF HUNTINGTON v. PUBLIC SERVICE COMMISSION.

Submitted December 9, 1921.    Decided December 14, 1921.

1. PUBLIC SERVICE COMMISSION—*Finding of Fact—Review.*

    Findings of fact by the Public Service Commission, based upon evidence to support them, generally will not be reviewed by this court.   (p. 710).

2. RETURN—*Value of Property as Basis.*

    In order that it may receive just compensation for the use of property which it has devoted to the service of the public, a utility is entitled to demand and receive a fair return upon the reasonable value of the property at the time it is being used by and for the public.   (p. 711).

3. PUBLIC UTILITIES—*Ownership of Property—Indebtedness.*

    A public utility having a large bonded indebtedness remains the owner of the entire property which it devotes to public service, despite the existence of the indebtedness as a lien against it.   (p. 717).

4. RETURN—*Encumbrances on Property.*

    An owner of property devoted to public service is entitled to earn a reasonable return upon the whole of that property, whether it be encumbered by indebtedness or not.   (p. 716).

5. SAME—*Full Value of Property—Indebtedness.*

    A public utility having a large bonded indebtedness is entitled to earn as a profit a reasonable return upon the full fair value of the property which it owns. Its net earnings can not lawfully be measured by a reasonable return upon the difference between the outstanding indebtedness and the full fair value of the property, plus interest upon the indebtedness. Judges POFFENBARGER and LIVELY, dissenting.   (p. 715).

6.  SAME—*Deprivation of Reasonable Return—Confiscation.*

    Deprivation of the right to earn a reasonable return upon the full fair value of its property amounts to a confiscation thereof *pro tanto.* (p. 718).

7.  RATES—*Must Not be Confiscatory or Exceed Value of Service to Consumer.*

    A rate which a utility is authorized to charge must not be so low as to be confiscatory, nor so high as to exceed the value of the service to the consumer. A just and reasonable rate must fall somewhere between these extremes. (p. 718).

8.  RETURN—*Elements to be Considered—Reasonable Amounts.*

    In the ascertainment of a reasonable and fair return upon capital used by a corporation engaged exclusively in the business of supplying water to a city and its inhabitants, whose stock and bonds represent money actually employed in the business, the amount of interest annually paid on its indebtedness and the dividends it pays or can pay upon its stock are material and forceful elements to be considered, and it is not entitled arbitrarily to rates that will produce sufficient net income to provide, after payment of all taxes, for 2% for depreciation and 7% as a return to it, calculated upon the estimated value of all its property, it appearing that more than two-thirds of the money used in its business is borrowed at the rates of 5% and 6%. (p. 718).

(MILLER and LYNCH, JUDGES. dissenting).

Original jurisdiction.

Petition by City of Huntington for suspension of order of Public Service Commission.

*Order of Public Service Commission suspended.*

*Deegan & Hall,* for petitioner.

*Fitzpatrick, Campbell, Brown & Davis,* for Huntington Water Corporation, respondents.

LYNCH, JUDGE:

The first question to be answered is: Does the order entered by the commission preclude the right of the City of Huntington to ·prosecute this review? After fixing July 1, 1921, and the date of the June meter readings as its effective dates, and providing for continuation of its effectiveness un-

til January 1, 1922, and the enlargement of applicant's service in certain particulars not now involved, the order concludes: "It is further ordered that the applicant file with the Commission, on or before the 20th day of January, 1922, a complete report setting out in detail its monthly revenue and operating expenses for the period from the first day of July, 1921, to the first day of January, 1922. Also setting forth what additions and improvements it has made during the said period and what further additions and improvements are under construction at the time of the filing of the said report. And for the purpose of receiving said report and taking such action thereon as the Commission may deem proper, this case is retained upon the docket."

This, it is argued, is not a final order within the meaning of section 16, chapter 15-O, Code 1918. Its provisions are in substance and effect the same as those contained in the order reviewed in *City of Charleston* v. *Public Service Commission*, 83 W. Va. 718, 721. The opinion in that case properly conceived the existence of a difference between the order dealt with and the order reviewed in *City of Bluefield* v. *Bluefield Water Works & Improvement Company*, 81 W. Va. 201, in that in the latter there was no such alteration of the respective rights of the parties concerned as warranted interference with the provisional order of the commission, or, to use the language of the opinion in the Charleston case, "there," meaning the Bluefield case, "an increase in the rates had been granted by an experimental order, and neither the city nor any of its inhabitants were complaining of the increase allowed, but the water company was complaining that the increase allowed it was not sufficient * * * *. If, however, we take the view that what the legislature meant" (by the use of the word "final") "was such an order as grants relief to one party or the other, and changes the situation of the parties to their material advantage or disadvantage, the order complained of here is such an order." In the case now considered there is such a change. The rate increase asked by applicant the commission substantially granted, thereby increasing its gross and consequently its net annual earnings, to the detriment of its consumers, if

· 89 W. Va.

the revised rate schedules and the approved percentage produce inequitable results. The water corporation's revenues necessarily will be more from the operation of the property according to the revised schedule than according to the schedule thus superseded. These accretions must come from consumers of water provided for their use and convenience. The situations of the parties, the water corporation and its patrons, are affected, one favorably, the other unfavorably. The observations made have for their purpose, and are relevant only to show the order to be within the purview of that provision of section 16, chapter 15-O, Code 1918, empowering this court to review the commission's orders. Viewed in the light of that section, the order considered is within the power so conferred.

It is hardly necessary to enter upon a prolonged discussion of the right to review the action of the commission, a right questioned because of the "purely administrative" character of the proceedings contemplated by the statute, chapter 15-O, creating the commission and delegating to it the, authority formerly possessed by the legislature alone. A schedule of rates for a public utility that effects inequitable results is and always has been the subject of judicial enquiry, whatever may be the source of the authority prescribing such rates. As said in *Chicago & G. T. R. Co.* v. *Wellman,* 143 U. S. 339, 344: "The legislature has power to fix rates and the extent of judicial interference is protection against unreasonable rates." In *Budd* v. *New York,* 143 U. S. 517, there is this further remark: The "cases all support the proposition that while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything, which in the form of a regulation of rates, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing new or strange in this." How may courts without a judicial investigation in the form of a review determine the reasonableness of a rate? The act itself, section 16, if it does not expressly grant it,

clearly implies authority for the review when the matter of rates is involved whether they are excessive from the standpoint of the patron, or unreasonable from the standpoint of the utility. In either event this court is to "decide the matter in controversy as may seem to be just and right." The Supreme Court of the United States says: "If the law be such as to make the decision of the legislature or of a commission conclusive as to the sufficiency of rates, this court has held such a law to be unconstitutional." *Missouri Pacific R. Co.* v. *Tucker,* 230 U. S. 337, 340, 57 L. Ed. 1507, 1510, citing *Chicago M. & St. P. R. Co.,* 134 U. S. 418, 33 L. Ed. 970.

It can not reasonably be said that there can not be a review except when the rates are confiscatory. The commission's authority relates to the effect they produce, that is, whether they are reasonable, just and fair to the utility and its patrons. The result must not be inequitable to either, the rights of both are to be considered and preserved. If either is to be protected to the disadvantage of the other, the utility must bear the consequences.

The order entered by the Public Service Commission upon the application of Huntington Water Corporation, a utility engaged since 1886 in supplying water for use and consumption by the inhabitants of the City of Huntington and vicinity, is the subject matter of this investigation. To obtain a review of the order and direct its temporary or permanent suspension, City of Huntington challenges its correctness upon several theories. The order and the opinion considered together state the facts ascertained by the commission as a result of its investigation based upon the testimony of competent witnesses examined by the parties to the controversy.

The present fair value of the property of the Huntington Water Corporation, useful and used in the service of the public, as so ascertained and determined for rate making purposes, is $1,150,000.00 on which the commission allowed nine per centum to provide a fund sufficient to meet the constant tendency of the property to depreciate in value by reason of the service to which it is devoted, and a reasonable return to the owner after payment of the expenses of opera-

tion, including taxes and other charges of the same general character. The property valuation at the prescribed rate will yield $103,500.00 annually. The schedule of water rates superseded by the order involved would, as estimated by the agents of the corporation, yield an operating revenue for the year 1921 of $167,389.32, and a net revenue of $70,959.40, the expense of operation for the same period being $96,429.92.

According to the claim of the water corporation, the exigencies of its business require an additional $32,541.54, but from this amount the commission deducted $2,541.54, leaving only $30,000.00, the difference in the two amounts being asked for to meet the variance in the revenues, as estimated by the engineers for the water corporation and the commission respectively. Or, instead of $103,500.00, which the commission found to be a reasonable return upon the corporation's property, it provided for a net return of $100,995.40. If from this sum there is deducted, as it should be, the $8,739.96, the depreciation reserve, there remains $92,255.44 available for use in the payment of interest on the mortgaged indebtedness of the corporation and for distribution among its stockholders in the form of dividends, if the property valuation as fixed by the commission is approximately correct.

The outstanding capital stock of the corporation aggregates $227,000.00, and its bonded indebtedness $800,000.00, one part of which bears five per cent, the other six per cent interest, the total interest charge being $47,234.00. If this charge is deducted from the net return, as we have ascertained it to be, the result is $45,021.44 available for distribution as dividends on capital stock, or to surplus account or such other use as the company may choose to apply it. Because this net balance, when applied to the payment of dividends on the par value of the stock, is unusual, the City of Huntington protests that an increase in the schedule of rates sufficient to yield such balance is without legal warrant, exorbitant and therefore in excess of the demands of justice and fair treatment.

The protestant, City of Huntington, also assails as excessive and erroneous the valuation placed upon the company's

property for rate making purposes. The valuation repre-
sented by the figures, $757,831.67, according to its conten-
tion, more nearly approximates the fair value of the prop-
erty as its engineer found it to be. The report filed by the
company's engineer shows the value to be $1,260,408.43. In
arriving at this result he used as a basis for computation a
valuation which he made of the same property in 1915 while
serving the commission in the same capacity, and he found
the property then reasonably worth as an investment the
sum of $1,178,641.00 as of the first day of that year. In his
appraisal, in order to reach an approximate value for the
purpose of the application of the water corporation then
pending before the commission, he adopted the reproduction
cost new less depreciation theory of valuation for properties
appropriated to the use and benefit of the public, accepting
as correct the average unit prices of labor, material and
equipment covering a period of five years prior to January
1, 1915. Sometime thereafter he severed his connection with
the commission and entered into the employment of the water
corporation, particularly with reference to the ascertainment
of the property valuation for the purpose of the present
proceeding.

From the 1915 amount, with some corrections of minor
importance, he first deducted the depreciation of the prop-
erty since that date and added the actual cost of all subse-
quent additions to it and found its fair value for rate making
purposes to be $1,260,408.13 as of November 30, 1920. An-
other engineer also employed by the city undertook to value
the property from an historical point of view less depre-
ciation. As the result of his investigation did not prove
satisfactory to the commission, it declined to accept his find-
ing, because the corporation's books did not contain suffi-
cient data from which to determine with the requisite degree
of certainty the actual or approximate cost of the property,
and also because he did not attempt to show its cost prior
to 1899, and of his method of determining the depreciation
that has accrued since that year.

With these different results and the testimony of compe-
tent witnesses explaining the different theories applied be-

fore it, the commission, after considering both reports and the testimony, accepted as representing more nearly the reasonable value of the property the report of Anderson but reduced his amount to $1,150,000.00, which is less than the 1915 valuation. The method of computation adopted and followed by him in substance and effect is the same as that approved in *Charleston* v. *Public Service Commission*, 86 W. Va. 536, where, as in this case, no books showed the cost of the property. Under such circumstances there can be no serious or valid objection to the method adopted and pursued by .Anderson, especially where, as in both cases, ''the valuation was made under normal conditions when prices of material and labor were not inflated.'' This fact the commission recognized as being important. There being ample evidence to support the commission's findings, this court can not and will not disturb them. *Norfolk & Western Ry. Co.* v. *Public Service Commission*, 82 W. Va. 408; *Mill Creek Coal & Coke Co.* v. *Public Service Commission*, 84 W. Va. 662; *City of Charleston* v. *Public Service Commission*, cited.

A controversy has arisen as to what constitutes the investment on which a public utility is entitled to a fair return from the operation of its property for public convenience, and for the most part this is the main ground of complaint against the schedule of rates fixed by the commission. As applied to the facts involved, the question is whether the proper basis for the computation in the process for the ascertainment of .a reasonable or fair return for the service rendered is the fair value of the property in its entirety, or, that valuation less $800,000.00, the amount of the corporation's bonded indebtedness, a difference of $350,000.00. It is not, however, reasonable to suppose that the proceeds derived from this source represent anything like the amount the property has cost during the more than thirty years of its service in behalf of the public. Earnings of the company doubtless have gone into betterments, perhaps beyond the amount represented by the proceeds, and it may be, even beyond the valuation now considered. With this contention there is allied the still further argument or claim that to the extent the bonds represent investment in the property, the

measure of the return to the water corporation is the rate
of interest they bear.   That is, the corporation is not en-
titled to a return on the $800,000.00 indebtedness at a rate
in excess of interest on that amount, and, therefore not upon
the fair value of the property considered as a whole, without
regard to the encumbrances on it.   Or more briefly, the
utility can not, it is argued, be permitted to earn a net re-
turn on the property in its entirety, but only on $350,000.00,
the company's equity in it.

With practical unanimity courts have held that the return
is to be based upon the present fair value of the property
devoted to public service.   In the leading case of *Smyth* v.
*Ames,* 169 U. S. 466, the rule was first announced in this
language: "We hold, however, that the basis of all calcula-
tion as to the reasonableness of rates to be charged by a cor-
poration maintaining a highway under legislative sanction
must be the fair value of the property being used by it for
the convenience of the public. * * * *   What the company
is entitled to ask is a fair return upon the value of that
which it employs for the public convenience."

The court did, it is true, in that case remark that "if a
railroad has bonded its property for an amount that exceeds
its fair value or if its capitalization is largely fictitious, it
may not impose upon the public the burden of such increased
rates that may be required for the purpose of realizing
profits upon such excessive valuation or fictitious capitaliza-
tion," but by way of precaution added: "and the apparent
value of the property and franchises used by the corporation,
as represented by its stocks, bonds and obligations, is not
alone to be considered in determining the rates that may be
reasonably charged."   But by no means is this statement to
be interpreted as a limitation upon the right of such a cor-
poration to base its right to a net profit upon the fair value
of its property without regard to the interest charge on its
bonded indebtedness.   Evidently these remarks are not so
understood by the subordinate federal courts, for Circuit
Court Judge Hunt in *Montana W. S. R. Co.* v. *Morley,* 198
Fed. 991, 1007, said: "But we must not accept the amount
of the bonded debt as a complete or accurate criterion of the

value of the property'' and approved the language of President Hadley of Yale University in the report of the Railroad Securities Commission to the President of the United States, dated November 1, 1911, saying: ''Insofar as the value of the property is an element in rate regulation, the outstanding securities are of so little evidentiary weight that it would be of distinct advantage if courts and commissions would disregard them entirely except as a part of the financial history of the property, and would insist upon direct evidence of the actual money invested in the properties.'' See also: *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 53 L. Ed. 371; *Louisville & N. R. Co.* v. *R. R. Commission*, 196 Fed. 800; *Texas & P. R. Co.* v. *R. R. Commission*, 192 Fed. 280.

The present fair value of the property devoted to public use is the rule prescribed in the Minnesota rate cases, 230 U. S. 352, 355, 441. The same court has gone further and held that the return guaranteed by the Constitution of the United States is a return upon the ''reasonable value of the property at the time it is being used for the public.'' *San Diego L. & T. Co.* v. *Jasper*, 189 U. S. 439, 442.

And in *Simpson* v. *Shepard* (Minnesota rate cases, *supra*), the court, speaking through Mr. Justice Hughes, also said: ''As the company may not be protected in its actual investment if the value of the property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership, and it is that property and not the original cost of it, of which the owner may not be deprived without due process of law.''

In discussing the basis of valuation upon which a fair return must be allowed, the New Jersey Supreme Court in the case of *Public Service Company* v. *Public Service Board*, 84 N. J. L. 463, 474, said: ''We are met with difficulties and valid objections whether we adopt the standard of actual investment, of cost of reproduction or present value. It would be a waste of time for us to go into this discussion. We think it enough to say that the great weight of authority is in favor of the standard of present value. That standard has the sanction of the United States Supreme Court in

cases involving the constitutional rights of the companies and is said by that court to be no longer open to dispute under the constitution. *San Diego L. & T. Co., supra.* Since all cases of the kind may come before that tribunal for final adjudication, and its decision upon the constitutional question would be binding upon us, we ought to adopt the same rule.'' As said in *Home Telephone Co.* v. *Carthage,* 235 Mo. 644, 48 L. R. A. (N. S.) 1055, Ann. Cas. 1912-D 301, ''What the company is entitled to demand in order that it may have just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public.'' This is the rule adopted and observed in Oklahoma as well as in nearly all of the state and federal courts where rate making cases have been considered and decided. *Pioneer Telephone & Telegraph Company* v. *Westenhaver,* 29 Okla. 429, 38 L. R. A. (N. S.) 1209; *Western Union Telegraph Company* v. *State,* 31 Okla., 415; *Kennebec Water District* v. *Waterville,* 97 Me. 185, 54 Atl. 6, 60 L. R. A. 856; *Redlands L. & C. Domestic Water Co.* v. *City of Redlands et al.,* 121 Cal. 365, 53 Pac. 843; *Oshkosh Water Works* v. *R. R. Commission,* 161 Wis. 122, 152 N. W. 859, L. R. A. 1916-F 592.

There are, it is true, some decisions that do for some purposes take into consideration the reasonableness of rates in connection with the original cost of property employed to promote the general welfare of the community in which it is located with reference to rates ample to pay fixed interest charges and dividends without express recognition of the rule so abundantly sustained by the authorities cited and many others that could be cited that the present value of the property represents the amount on which the return must be computed. They treat the capitalization and indebtedness as relevant in the ascertainment of the true property valuation and for no other purpose. The only cases found upon this investigation so holding are *Reagan* v. *Farmers' Loan & T. Co.,* 154 U. S. 362; *Dow* v. *Beidelman,* 125 U. S. 680; *Ball* v. *Rutland R. Co.,* 93 Fed. 513; *Chicago M. & St. P. R. Co.* v. *Smith,* 110 Fed. 473; *Wallace* v. *Arkansas C. R. Co.,* 118 Fed. 422, 55 C. C. A. 192.

In the Reagan case the question was whether in the oper-

ation of the properties of the defendant, a railroad corporation, the schedule of rates prescribed by the Texas Railroad Commission were such as to yield revenues sufficient in amount to pay current expenses, taxes, etc., depreciation, interest on bonded indebtedness and a net profit sufficient to pay dividends on the company's capital stock. This was the paramount question involved and decided. All others were important only upon questions of jurisdiction to review acts of the commission. After adjudging the tariffs to be insufficient to yield an amount large enough to compensate the owners of the capital stock in a reasonable amount in dividends, all the circumstances of the case being considered, the court in replying to an argument upon the subject, added what certainly seems significant: ''If the state were to seek to acquire the title to these roads under the power of eminent domain, is there any doubt that the constitutional provision would require the payment to the corporation of just compensation, that compensation being the value of the property as it stood in the markets of the world, and not as prescribed by the legislature? Is it any less a departure from the obligations of justice to seek to take not the title but the use for the public benefit at less than its market value?''

In *Dow* v. *Beidelman*, a suit the object of which was to determine whether a rate of three cents per mile for the carriage of passengers by railroad was not sufficient compensation, the argument was: ''that with the same traffic that their road has now, and a charging for transportation at the rate of three cents per mile, the net yearly revenue will pay less than 1½ per cent on the original cost of the road, and only a little more than 2 per cent on the amount of its bonded debt.'' The court did not decide the question presented because there was not in the record any ''evidence as to how much the bonds cost or as to the amount of the capital stock of the corporation as reorganized or as to the sum paid for the railroad by that corporation or its trustees.'' There was involved in *Ball* v. *Railroad, supra,* the question of the impairment of the charter provision of the railroad, ''giving it the right to fix the rates of fare on its road within certain limits,'' was considered and the court held that subsequent

legislation reducing the rates of fare below the limit and below "what will permit the railroad company to earn a reasonable income on the capital invested" is in violation of the fourteenth amendment as a taking of property without due process of law. In *Railroad Co.* v. *Smith, supra,* the court, acting upon the findings of a master in chancery, accepted the valuation of the company's property devoted to public use as the basis for compensation to determine whether at the schedule of rates the company could earn a net profit from the operation of its property in an amount sufficient to pay fixed charges and discounts, and as result of the computation upon that basis, the court found the schedule insufficient. In substance and effect the language of *Wallace* v. *Railroad Co.* is the same. The court must have had before it the value of the property, else it could not have found upon demurrer to the bill the reduction of the gross earnings from the property to be far below an amount required to reimburse the company by the payment of operating expenses, taxes and fixed charges.

There does not appear any sound principle of law that sanctions any other measurement for the return a utility is entitled to, than a rate, which when applied to the fair valuation of its property useful and used in behalf of the public, without regard to its capital stock or its mortgaged indebtedness; except that no rate of return is allowable unless it is sufficient under ordinary circumstances to cover the expenses incident to the operation of the property, including taxes, depreciation, interest and dividends. The facts proved and practically conceded do not even tend to show that the management of Huntington Water Corporation has not always been efficient and the service rendered by it satisfactory. There is no charge against it of any character except as to rates and the method of appraisement of its property. It has faithfully performed the duties, the performance of which it assumed when organized. No question has arisen as to watered stock, inflated prices, inefficient administration or incompetency of its officers and agents. The only hint is its increase in salaries in anticipation of its application for a more remunerative schedule of rates. But the

salary increase is insignificant compared with the service rendered.

Enough has been said to show that the present fair value of the property devoted to the service of the public is to be made the basis of the return to the owner or proprietor. This has been the rule recognized and applied heretofore by this court. *City of Charleston* v. *Public Service Commission,* 86 W. Va. 536; *Bluefield Water Works & Improvement Co.* v. *Public Service Commission,* 89 W. Va. 736, recently decided. The amount of capitalization and bonded indebtedness of a public service company ordinarily is no test of the value of the property. 7 Fletcher, Cyclopedia of Corporations, Sec. 4536; Wyman, Public Service Corporations, Sec. 1092, cases cited. It is not the amount of the stockholders' investment in the property, nor of their so-called equity, that determines the basis of the yield, but the value of the property devoted or dedicated to public use.

The final question to be discussed and decided is the net income the corporation may properly have from the operation of its property, as valued by the commission, such income as the corporation may use for the exigencies of its business, or may require for distribution among its stockholders in the form of dividends or otherwise. It is upon the answer to this question that a difference of opinion has arisen among members of the court. President RITZ and Judges POFFENBARGER and LIVELY would measure or test the rate of income by the corporation's equity in the property, either coupled with or independent of the amount of the corporate stock and indebtedness, or by each separately, or for some purposes in connection with the appraised value of the property. Judge MILLER and I base the income rate exclusively upon such valuation, disregarding as irrelevant and unimportant the equity, encumbrance and stock, insofar as they affect the corporation's right to income. Our conception of the basis of that right is the value of the corporation's property, the property it owns, the property in its entirety, the property the corporation has set apart to serve the public. It does not own the stock, it does not own, but owes the indebtedness, and neither the stockholders nor the creditors

own the corporation's property. The sole owners of the property is the corporation, and the corporation has the unqualified right to control and manage the property to promote the welfare of the public. The only interest the creditors have in the property resides in the indebtedness, and the only interest the stockholders have in the property is in the dividends to be paid and in the persons who shall manage and control the corporate business. In line with these observations, as it seems to the writer, is the language of the opinion in *Coal & Coke Ry. Co.* v. *Conley,* cited, (p. 190) : "Exorbitant rates can not be exacted from the public for the sole reason that persons interested in a corporation have contracted with it and with another for profits in excess of that which amounts to a reasonable and fair return on the money actually invested or the equivalent of the actual value of the plant. The capitalization may far exceed the utmost value of the company's property for some reason." This argument was intended to answer and did answer the claim advanced that the rate of income should be adequate to pay dividends on the company's stock issues and interest on the company's indebtedness, though these items may with others have exceeded the fair value of the property.

A corporation is an entity wholly distinct from the owners of its capital stock. It has the legal title to the corporate property, its shareholders do not have any title to it. Each has a separate existence, separate interests and separate liabilities, and, insofar as the right of an individual member of the company to its earnings is concerned, he is entitled only to his proportionate share of the surplus profits. The corporation is the real person. *Park* v. *Petroleum Co.,* 25 W. Va. 108; *Moore* v. *Schoppert,* 22 W. Va. 282; *Kanawha Coal Co.* v. *Ballard & Welch Coal Co.,* 43 W. Va. 721. If the capital stock and indebtedness of a corporation are to be excluded from the appraisement of its property as the basis of the return it is entitled to when they exceed the value of the property, why should they not also be excluded from consideration for any and all purposes when they are materially less than its value? Although not directly in point, it may not be amiss to remark that in *Towne* v. *Eisner,* 245

U. S. 418, 425, the Supreme Court of the United States held in effect that dividends in the form of stock are not income as the word is understood, and that stock dividends are not taxable as such under the federal income tax law of 1913.

There is no immutable standard for the measurement of the income a company serving the public is entitled to under all circumstances and conditions, and in the very nature of things there could not be. The facts of each case differ from the facts of every other case. No two of them are any more alike than are two or more faces.

Neither is the legal rate of interest a safe or certain guide, as the authorities say. In some instances a utility may require a greater percentage of income than the law prescribes, and in others less than such a rate. But usually the authorities agree that the basis of the rate is the value of the property devoted to a public use, not the utility's stocks or bonds, and with this as a starting point, sanction a rate which will produce such a net income as will repay in profits a just and reasonable compensation for the use of the property so valued, whether the rate is more or less than the legal interest rate, inflated prices being excluded. If the rate is excessive in its results in that it yields more than is just and fair to the consumer it then is an unreasonable rate but if it does him no injustice he can not be heard to complain. The only injustice of which complaint is made is not by the consumers directly, but by the City of Huntington, the sole protestant, and the basis of its complaint is that the company's stockholders receive a greater percentage of dividends than they should have, and for that reason the city injects the amount of the capital stock and the indebtedness into the balance where otherwise other matters may be in a state of equipoise. By the proposed method and by it alone can it be made to appear that the 9% rate is inequitable.

To say the least, the rules now advocated are innovations upon the rules generally recognized as being approximately just and fair, where the conditions are normal. If the former should receive general judicial approval from what source would a company, engaged in the performance of a public duty with a valid capital stock or a valid indebtedness

in excess of the estimated, though not the fair value of its property, earn a profit from the operation of its property, if the operating expenses and interest charges exhausted the gross revenue? That condition would necessitate railroad receiverships practically without limit, and deter capital investment in any public enterprise.

As it seems to me, a return is not reasonable when limited to interest upon indebtedness and a mere dividend on stock without allowance for the additional risk assumed and entailed in a public business.

To warrant suspension of a schedule of rates lawfully authorized, on the ground of alleged unreasonableness, the disparity between what is reasonable and unreasonable ought to appear sufficiently clear. If it does not work a hardship upon the community served, it ought not to be suspended. There is in this case an obvious lack of imposition upon the water consumers, and an equally evident lack of an undue return to the utility. It can not, therefore, be contended, even if important in view of what has been said, that the order provides a fund to be assessed to and collected in advance from water consumers for a substantial enlargement of the corporation's water supplying instrumentalities and their extension so as to increase the number of its patrons, and consequently the quantum of revenue the betterments will yield when completed and paid for, as well as the value and efficiency of the applicant's property. Even if there be a demand for such improvement, no rule or principle of law authorizes advancement of rates for water furnished to consumers in order to raise a fund to be administered and applied in advance to defray the expenses incident to the improvement. The corporation must resort to other financial sources, as by the negotiation of loans, or by the issuance and sales of capital stock to obtain the means to meet such expenditure. Reason and authority dictate such a policy; No. 3400, 20 I. C. C. R. 266, where the Interstate Commerce Commission denied the demand for railroad transportation rates to enable the carrier to improve its property, and permission to make such increases, and said that for the purpose of determining whether a given advance is reasonable, the

railway ought not to treat as a part of its operating expenses the cost of permanent improvement or extensions, and this must of necessity mean that the rates should not be sufficient to allow both payment of dividends to stockholders and interest to bondholders and an additional sum for the purpose of improving and increasing the value of such property. See also pages 335-336, same volume, ''Intent to increase the plant value through improvements although such improvements are partially completed can not be accepted as the basis for the purpose of fixing rates, the actual fair value at the time used and useful in the business of furnishing service to the public being the true basis for calculating proper charges,'' *Re Seneca Telephone Company,* P. U. R. 1919 F, 48; *Re Farmers & Merchants Telephone Company,* P. U. R. 1918 F, 283; *Re Missouri & Kansas Telephone Company,* P. U. R. 1918 C, 55.

Judge MILLER and I do not agree to a suspension of the order reviewed.

RITZ, PRESIDENT, (*concurring*):

Some statement of the reasons which impel me to the conclusion to suspend the rate involved in this case is not inappropriate as it does not seem that any of my brethren concur in all of the views which I entertain.

In every case where the validity of a rate is involved it is, of course, necessary, in order to reach a conclusion, to determine as a basis therefor the value of the thing upon which the return is to be based. I quite agree that a public service corporation is entitled to a fair and reasonable return upon the value of the property devoted by it to the public service. Entertaining this view, the first question then presented is, how is that value to be ascertained? In the early history of rate making almost exclusive consideration was given to the amount of bonds and capital stock outstanding. It was soon found that such a method was manifestly unjust, for in many instances all of the capital stock was given as a bonus to the bondholders, and in others the bonds sold at a much depreciated price, and in still others inordinate sums of money

squandered for promotion expenses. The books are full of cases repudiating this method as an exclusive one for arriving at the value of the property of a public service corporation for the purpose of rate making. It was then thought that while the par value of the bonds and the stock was not a sound basis, the market value, where the same could be ascertained, of these securities, would furnish a reasonably safe point from which a start could be made. It was argued that the value of the bonds and stocks of the corporation in the market ought to represent with reasonable accuracy the value of its properties, and this would seem to be so as an abstract proposition, but actual experience soon taught that market values of stocks and bonds depended upon many elements besides the actual value of the property upon which they were based, so that this method could not be considered as an exclusive method of determining the property value for the purpose of making a rate. The actual cost of the property, where it could be ascertained, has often been considered as the most reliable basis for rate making. If it can be ascertained what it actually cost to construct a given plant, and it is shown that the work was economically done, there would seem to be no reason why this would not be the most satisfactory basis for arriving at the value of the plant for rate making purposes. Of course, this leaves out the element of the increase in property values because of increased population, or other contingencies, which may result in a substantial advance in the value of the investment, which it is conceded a public service corporation should have the benefit of, as well as any other property owner. Because of the fact, however, that many such corporations had no data from which the actual value could be ascertained, and because of the unreliability of the other methods above pointed out, various rate making authorities resorted to the theory known as reproduction new less depreciation, which consists in having experts make an inventory of the properties to determine what it would cost to reconstruct such a plant under existing conditions, and at existing prices, deducting from this result an arbitrary amount for the depreciation of the plant during the time it had been in existence.

While this method was resorted to originally, because of the paucity of information as to the actual cost of the plant, it is now very generally insisted upon, particularly in these times of high prices, by public service corporations as the exclusive method for determining the value of their properties for rate making purposes. My own view is that it is the most unreliable of any of the methods which may be employed to that end. In the last analysis it is no more than the estimate of an engineer as to what it would cost to reproduce a certain plant, and anyone who has ever had experience with construction work will readily testify as to the unreliability of such estimates when they come to be compared with actual costs. Then, too, such method does not take account of what to me seems a very important element, and that is that of two plants which it would cost exactly the same to reproduce one may have been maintained so as to render highly efficient service, while the other allowed to run down so as to be in no way capable of performing satisfactorily the functions for which it was designed, yet under this theory of reproduction less an arbitrary deduction for what is called depreciation both, if of the same age, would be valued for rate making purposes at exactly the same amount.

My own judgment is that there is no exclusive method for arriving at the value of a public service plant for rate making purposes. Those charged with the duty must take into consideration every element available. There is no reason why a public service commission or other authority seeking to ascertain this fact should not make its inquiry just as broad as the evidence available will permit, just as in arriving at any other fact which is made the subject of judicial or quasi judicial inquiry. The cost of producing a plant originally when it can be shown is certainly entitled to consideration, and even though it may be that the properties have increased in value because of the general increase of property in the community, this rate of increase can ordinarly be shown with as much certainty, if not with much more certainty, than the actual value of the plant can be ascertained by attempting to estimate what it would take to reproduce it. I

would not refuse to give consideration to the amount of stocks and bonds outstanding. If it be shown that the bonds were sold in the market honestly and at a fair price, and all of the money derived therefrom devoted to the construction of the utility, and the same be true of the outstanding stock, why is not the amount of such securities outstanding some evidence of the value of the property which was created from the proceeds derived from their sale? The market value of such securities should also be considered for if, as argued, the rate to be allowed to a public service corporation depends in a measure upon the risk taken by the investors, this risk would be largely reflected in the market value of the company's securities. I would not treat anyone of these methods as exclusive, or as being the sole method to be used, but would make their weight depend upon the degree of certainty which the evidence produced would attach to each of them. For instance, if the actual cost of the plant is shown with certainty, I would give to this evidence peculiar weight. If it were shown that all of the money derived from the sale of stocks and bonds fairly sold was honestly invested in the plant, I would give to this evidence more weight than if it did not appear what disposition was made of the proceeds of such bonds, or whether in the expenditure thereof the company acted with honesty and fairness. Nor would I exclude from consideration the evidence of reproduction cost, but I would not make it an exclusive method for determining the value of such a property any more than it can be said to be an exclusive method for determining the value of any other property where it is material to make an inquiry in regard thereto.

In this case it does not appear that the Public Service Commission adopted any exclusive method of arriving at its conclusion that the company's property was worth eleven hundred and fifty thousand dollars. It is true, as contended by the city of Huntington, that great weight is given to the theory of reproduction new less depreciation, but this is attempted to be excused upon the ground that what the Commission calls the analytical historical cost was not available, or at least, if available, was not made to appear upon

the hearing before it. As the case was presented to the Commission, I do not know that any fairer method could have been used in arriving at a result than was used, nor does it appear that the result arrived at is far from the correct valuation testing it by all of the evidence offered in the record.

There is, however, an element entering into this valuation which it occurs to me is without justification, and that is an item of approximately one hundred thousand dollars for the value of the plant as a going concern. It must be borne in mind in considering this case that the Huntington Water Company has a monopoly in the business in which it is engaged. This item of going concern value is said to be the difference between the value of a business fully equipped and ready to start and one actually started. It is argued that however fully equipped and ready for business a plant may be, it is not as valuable as a plant which is not only fully equipped but is enjoying a substantial business. This would be true with the ordinary concern engaged in private business where competition is met with. The expert in this case in his testimony illustrates what he means by this going concern value by taking an example of a coal company owning a lease fully equipped for business and comparing it with one like fully equipped, but which has already secured a number of valuable customers. In such a case the difference is apparent. The owners must go into the markets and secure the business if their plants are to be of any value, and of course the plant which had already secured it to a large extent is worth more than one just starting without any business. But can this have any application to a water company which enjoys an absolute monopoly? It does not have to go out and secure business; it locates its plant in a community where the exigencies of modern life call for the exercise of the agencies which it commands. It enjoys in that community a monopoly in the business in which it is engaged, and to my mind its plant is just as valuable when it is fully equipped and ready to turn on its water as it is one year or ten years afterward, assuming that there is no increase in the population in the meantime to add value to

its franchises. In view of the fact, however, that the valuation arrived at is at best only an estimate, I am not prepared to say that the inclusion of this item of one hundred thousand dollars gives to the Water Company any greater property value than it is entitled to even though the guise under which it is given cannot be justified.

After arriving at the value of the property involved, the next inquiry is, what is the Company entitled to receive as a proper and reasonable return thereon? It is stated that this reasonable return depends in a measure upon the risks attending the business, on the cost of money to the company, and to some extent upon what profits are ordinarly made in the community from like investments. The Commission in this case found that the Company was entitled to receive nine per cent. upon the value of the property as found by it, of which two per cent. is for the purpose of so-called depreciation, and the other seven per cent. is the fair return upon the investment.

The allowance which is made under the name of depreciation as applied to the ordinary public service corporation is really not depreciation at all in the ordinary sense of that term. It is an estimated amount which it is expected will be required to replace from time to time such parts of the plant as become either worn out or obsolete. The larger part of the Water Company's plant, as shown by the inventories filed in this case, is its pipes laid under the ground for the purpose of delivering the water to its customers. The life of such pipes as are used for this purpose under any particular condition has never been definitely ascertained. It is a matter of history that within recent years such pipes have been excavated in at least one of the larger cities of the country after being in use for a century, and have been found to be in a perfect state of preservation. But this allowance which is called depreciation is more properly devoted to the purpose of replacing equipment which becomes obsolete. It is apparent that in a growing community mains which are entirely adequate today may in the course of a few years, because of the increased demand for water, be insufficient to meet the needs of the community, and it is

necessary to replace such mains with larger ones. Of course, the pipes so removed may be and are used in making other extensions, but the cost of removing them and replacing them with other pipe has to be borne by the company, and it is largely for the purpose of taking care of such contingencies that the allowance is made for depreciation. From this it will readily appear that this allowance must depend largely upon the conditions shown to exist in the particular community served by the utility under investigation. If it is apparent that the community has reached its maximum growth, and no replacements are likely to be necessary except in those cases where the material is actually worn out, the allowance for depreciation, it is quite apparent, ought not to be as large as in a community which is only passing through its age of adolesence, and in which it may be expected that the company will be called upon to replace much of its system in order to meet the demands upon it from the increase in population. There is some showing in this record that the city of Huntington is such a growing community. The increase in population in recent years has been substantial, and there is no reason to doubt from the facts appearing in the record that the same rate of increase will be maintained, at least for some years to come. In fact, it is shown that because of this increased demand for service upon the Company it is now necessary for it to replace many of its mains with mains of larger size, and to add additional units to its pumping and filtering stations. While the evidence upon which this allowance of two per cent. is based is not very satisfactory, consisting principally of the statements of experts that two per cent. is a proper allowance under the circumstances, it does not appear that it may not be necessary for the company to spend. approximately the amount to be derived from this source for the purpose of replacing such parts of its plant as may become obsolescent or worn out.

The other seven per cent. which the Commission found the company was entitled to earn upon the value of its property, is awarded to it as a return upon its investment, and it appears that the Commission arrived at this amount without

giving any consideration to the character of the investment, or any part of it. The result sought in cases of this character is one that will not produce hardship on any of the interested parties, either the public or the utility. As before stated, this result must be arrived at from a consideration of a number of matters, among which is the cost at which the utility procures money, if it is found to be necessary to borrow money for its purposes. The risk which it runs in constructing a plant in a particular community is also to be considered, and, this risk, of course, depends upon whether or not the community is of that permanent and settled nature which may reasonably be expected to endure, or is without any past history, and without future prospects of a certain and definite nature. Of course, this risk will be largely reflected in the amount the company has to pay for the money that it borrows, and it may be said generally that where such a public utility can borrow money at a low rate of interest, or at the rate of interest usually prevailing in the community for perfectly safe loans, the risk incurred by the investor above that which is ordinarily incurred in an investment is negligible. The reasonable return such a utility is entitled to receive must be tested by the effect produced upon those to whom it ultimately goes, to-wit, the bondholders and stockholders. When we find a return which produces a sufficient income to meet all of the actual expenses of the company, to pay all of its taxes, provide a fund which is classed by the Commission as depreciation, pay the interest on the bonds, the proceeds of which it is shown in this case were properly expended, and then yield to the stockholders a rate upon the value of their stock—not upon the par value, but the actual value—largely in excess of what may be expected from a stable investment of the same character, it cannot be said that such a return is reasonable from the standpoint of the public. It is argued that the stockholders are entitled to more than the ordinary rate of interest because of the risk they incur, but as before stated this risk, if indeed there is any such element in this case, is reflected in the rate at which it is enabled to borrow money. If it can borrow money, as appears to be the case, at the same rate as other perfectly

solvent and stable corporations which are considered a sound investment, then how can it be said that the investor incurs any risk warranting an exercise of tenderness in his behalf upon the part of those charged with determining the rates to which the utility is entitled? It is insisted that a public utility is entitled to a reasonable return upon the value of its property devoted to the public service, and to this I readily agree, but what is that reasonable return? How must it be arrived at? Every one concedes that the rate of interest which the utility is required to pay for money that it borrows is in a large sense a measure of the return to which it is entitled. I cannot agree that a rate is reasonable which will produce to the stockholders, after paying all expenses, all fixed charges and taxes, a return largely in excess of what other people receive upon their money in investments no less stable and reliable. In this case the estimated gross receipts of the company for the year 1921, based upon the actual receipts for 1920, are fixed at $167,389.32. The operating expenses for the same period, arrived at in the same way, are $96,429.92. Included in this item of operating expenses is all taxes charged, or chargeable, against the plant, so that upon the figures produced by the company itself there remains the sum of $70,959.40 with which to pay a return upon the property devoted by it to the public service. Is this return adequate? It may be assumed I think, for the purpose of this case, that two per cent. is not unreasonable for what is termed by the Commission depreciation, and if we fix the value of the property at eleven hundred and fifty thousand dollars, twenty-three thousand dollars would be required for this purpose. This would leave $47,959.40 available to pay the investors a return upon their money. Is it sufficient for the purpose? According to the statement of the company's counsel the amount required for the payment of interest on the money borrowed is $47,234.00, which would leave only $727.40 with which to compensate the stockholders for the investment they have in the property. If the property is worth eleven hundred and fifty thousand dollars, and the bonded debt is eight hundred thousand dollars, as appears in this case, then the investment of the stockholders

is worth three hundred and fifty thousand dollars. A great deal of argument has been indulged in to the effect that the return to be received does not depend upon the amount of stock issued and outstanding. This is quite true, but it does depend in a large measure upon the actual value of the stock issued and outstanding, regardless of the par value thereof. The Commission found that in order to give to the company a reasonable return it would be necessary to add thirty thousand dollars to its receipts and increase the rates so as to accomplish that purpose. This would give to the stockholders practically nine per cent. interest on the actual value of their stock after all taxes are paid for them and suitable allowance made for keeping their property in a perfect state of repair, or about twelve per cent. if we exclude from the valuation of the property the item of one hundred thousand dollars for its value as a going concern. This result to me is inequitable and bizarre. I cannot find anything in the record which justifies the belief that there is any such risk in the investment as warrants granting a return largely in excess of that received by other investors. The rate of interest allowed by law in this state is six per cent., and when one loans his money on real estate mortgages he can only legally receive six per cent., and out of this he must pay taxes, while this company, with an investment as certain as the future of one of the principal cities of the state, is allowed from nine to twelve per cent. after the payment of all taxes. It is quite clear that the old rates do not yield a sufficient return upon the company's investment, and that it is entitled to some increase, but my own judgment is that any allowance beyond twenty thousand dollars in addition to the old rates is unreasonable and unjust, and should not be allowed, and for that reason I would suspend the rates allowed with leave to the Water Company to make application to the Commission, either in this case, or in a new proceeding, for such reasonable allowance.

POFFENBARGER, JUDGE, *concurring*:

Insufficiency of the existing rates to yield a fair return on the investment of the Huntington Water Corporation is per-

fectly obvious. Although the dividends paid within the past twenty-two years aggregate in round figures, the sum of $371,000.00, the equivalent of 318% of the capital stock, the depreciation for the same period, estimated by the expert employed by the City of Huntington, the Federal Audit Company, amounts, in round figures, to $328,000.00. Until 1917, no depreciation reserve was set apart. Upon the assumption that $8,000.00 per year has been set aside for that purpose, for the past four years, making $32,000.00, and adding this to the dividends paid, we have $403,000.00, less $328,000.00 depreciation, or $75,000.00, which would pay about $3,400.00 per year, or 1.5%. Of course, repairs and replacements have been made from time to time, out of earnings and new capital, but depreciation begins on the new work as soon as it is put in. In the absence of anything better or more accurate, it is necessary to rely to some extent, upon the principles, rules and theories of expert accountants and engineers in cases of this kind.

Applying their theory of depreciation which seems to be reasonable and well founded in some respects, we find that the amount taken out in dividends and reserves, off-set by the depreciation, leaves a clearly inadequate sum for profit on the investment.

Upon all of the facts stated in the Federal Audit Company's report, it is possible to see a return of about 8.7%. For a period of about seven years, next preceding the date thereof, the average annual net earnings, interest charge and surplus were, respectively, about $75,000.00, $40,000.00 and $35,000.00. But in these figures no provision has been made for depreciation. The annual depreciation on the present value given in that report, about $757,000.00, would be about $15,140.00 which deducted from the $35,000.00, would leave $19,860.00 available for dividends, or 8.7%. But the commission has found the operating expenses for the year 1921 will be necessarily increased to the extent of $7,000.00. Taking that off, we have $12,860.00, or about 5.6% on the par value of the stock, $227,000.00.

But, although based upon actual investment as shown by the company's books and the depreciation rule, the valua-

tion given in that report is largely theoretical. All of the property does not depreciate at the rate of 2% per year. On the contrary, the real estate and no doubt other factors appreciate from year to year. There is also the obvious probability that some of the more important materials used will endure beyond the estimated period of fifty years. The power plant and the water mains are the larger subjects of investment. The former may be good for only fifteen years and the latter for fifty or one hundred. Much depends too upon the care of machinery and appliances in the use thereof. Besides, the result obtain on the basis of actual investment and depreciation is limited to material value. It is only a circumstance to be considered in arriving at the utilitarian and market values. A twenty year old main will no doubt carry as much water and perform its functions as well as a new one of the same size and kind. When first put in many of the mains are no doubt capable of supplying twice or three times the actual demands made upon them. As population increases, calling for larger or full capacity utilization, they yield much greater returns, and value depends much upon the pecuniary returns of the use of property. The same thing is true of the power plant and all other general equipment. Huntington is a city of rapid growth and development. Hence, every foot of water main in its principal streets has an immensely increased utilitarian and commercial value, notwithstanding the depreciation from age and use.

An estimate of value made by Mr. J. K. Anderson, as of Jany. 1, 1915, for the Public Service Commission, and extended to 1920, for the Huntington Water Power Company, is founded upon reproduction new, at prices determined by the average for five years preceding 1915, and amounts to $1,260,000.00. But this includes two questionable items, $110,000.00 for cost of money, rejected by the Commission, and $100,000.00 and better for going concern value. These two items eliminated, the Anderson valuation is likely as good evidence of the real value as that of the Federal Audit Company. The authorities seem to hold that present value is legally preferred to past value in the fixing of rates. Both

cost and estimated market value are clearly probative of actual material value.

In view of all the facts and circumstances, it cannot be said that the value fixed by the commission is too high. It exceeds the taxation value by only $250,000.00 and the bonded indebtedness by only $350,000.00. This excess of value over and above the indebtedness seems to be a very fair indication of the value of the outstanding capital stock.

The average five year surplus of $35,000.00, less $15,140.00 for depreciation, would yield only 5.36% on this valuation. If the estimated increase of $7,000.00 in operating expenses be deducted, also, it will yield only about 3.6%. The allowance of rate increases so as to produce an additional income of $30,000.00 would swell these percentages to 14.2 and 12.2, respectively. For the year ending June 30, 1920, the surplus was a little less than $33,000.00. Hence, the calculations of returns based on it would lower all of these percentages slightly.

For the calendar year 1920, the total operating revenue was $162,952.68 and the operating expense, less an allowance for depreciation, was $88,064.14, making the net earnings $74,-888.54. Deducting from this the average amount of interest paid annually, over a period of seven years, $40,060.35, we have $34,828.19. If, from this, we take $23,000.00 for depreciation, 2% of the value, and then add $30,000.00, the allowed increase, we have $41,828.19 for net profit for that year, or 11.95% on the value of the stock. The forecast for the year 1921, at present rates, makes the income $167,389.32 and the expense $96,429.92. The estimated net earnings amount to $70,959.40. Deducting the interest, we have $30,-899.05. Adding the increase of $30,000.00 and deducting the depreciation, we have for dividends $37,899.05, or nearly 10.83%.

As all taxes, interest and depreciation are deducted and the surplus is strictly net, the increases allowed will produce an annual dividend far in excess of what the use money is usually deemed to be worth in this state. Ordinarily, it is loaned at a rate not above 8%. Until within the past three or four years, the rate was below that, and no doubt the pres-

ent high rate will gradually decrease.   But, money loaned at
8% or 9% bears its taxes.   Here the taxes are deducted in
the ascertainment of the surplus, and they amount to about
3%.   In this connection, it is to be observed that the business
of the company is not particularly hazardous.   It is monop-
olistic in character with a special protection in the power of
the Public Service Commission to allow increases of rates in
case of necessity.

I am in serious doubt as to whether depreciation at the rate
of 2% should be allowed upon the entire value of the plant.
If the material value is only about $800,000.00, as indicated
by the Federal Audit Company report, and the remaining
$350,000.00 is the utilitarian, commercial or market value,
it is an obvious proposition, that the latter will not depreciate
at all, but, on the contrary, will appreciate with the continued
growth of the city.   It seems to me, therefore, that the 2%
should be calculated and allowed only upon the sum of $800,-
000.00, making the deduction $16,000.00 instead of $23,-
000.00.   Upon that basis the rate of profit would be 2%
higher, or 12.83% approximately.   The Anderson valuation,
subject to the two deductions therefrom above mentioned, is
based upon the theory of material value only, but it is a
mere estimate, and the average net earnings through the
seven year period, shown by the Federal Audit Company re-
port, sufficient to pay about 8% on $350,000.00, indicate that
it is about the entire value of the plant.

In the tests I have applied in the determination of reason-
ableness of rates, the value of the property has not been ig-
nored, but, in view of all the circumstances, it is deemed un-
fair and unreasonable to provide for income upon it alone,
at a fixed and arbitrary rate so high as to make the stock
yield an abnormal dividend rate.   It is an estimated not a
definitely known value.   It fluctuates as other values do.   The
value of a plant depends in large measure upon what it pro-
duces as profit.   To take the value alone and put out of view
the manner in which the capital has been provided, opens
the door to the making of an incidental profit on borrowed
money put into the business, rather than out of the business
itself.   That $800,000.00 of the money representing the value

of the plant is borrowed at 5%, imposing an annual interest charge of $40,000.00, is a circumstance that should be considered. Allowance of an additional 3% on it, or $24,000.00 of income, is an allowance of that much more than the service rendered the public actually costs the company. Instances are readily conceivable, in which such an allowance would amount annually to 100% or more upon the capital actually paid into the treasury of a company by its stockholders.

I do not interpret the decisions as having fixed the meaning of the terms "value of property used or employed in the business," in their dispositions of rate cases. Of course, the company is the legal owner of property purchased by it, with borrowed money, and used in the business; but, strictly speaking, the borrowed money is not capital. It represents a debt, not capital stock. In a sense, it is hired capital and costs the borrower only the interest paid on it. Viewed in a practical rather than a legal or technical, sense, it is not capital owned and devoted to the public use by the company, nor need the property represented by it be so treated. What an individual or corporation is worth or actually owns, in the ordinary sense of the words, is what remains after setting off the debts against the value of the assets. The practical, rather than the legal, sense of the words may well be adopted in their use for rate purposes, when there is a substantial difference between them; because the determination of the basis of a rate and the fixing of the rate are practical functions. The questions involved in them are practical ones into which legal principles enter incidentally to some extent. Hence, what constitutes capital or property in the ascertainment of the basis of the rate does not necessarily depend upon the legal or technical meaning of the terms. What of its own property a company engaged in public service actually devotes to the service may be the value of the capital stock, as determined by the value of all property legally owned by it, less its indebtedness. In California, a statute expressly makes the value of the property, in the legal sense of the terms, the basis of the rate, and some of the decisions of the Supreme Court of the United States, adopting that basis, are

founded upon that statute. In others, the value of the property was adopted apparently because the stock and bonds did not represent the actual investment, or represented property not used in the public service, along with the property that was so used, making it difficult or impossible to say what part of the stock and bond value was devoted to public service. These and other cases are sometimes treated as having adopted an arbitrary and inflexible rule forbidding the adoption of any other basis or qualification of the operation of the rule, when peculiar circumstances require variation to make it work out just and equitable results. *Oshkosh Water Works Co.* v. *Railroad Com.*, 161 Wis. 122; *Pioneer Tel. & Tel. Co.* v. *Westenhaver*, 29 Okla. 429; *Home Tel. Co.* v. *Carthage*, 235 Mo. 644; *Public Service Co.* v. *Public Utility Board*, 84 N. J. L. 463. In these cases, the question is not re-examined. In each of them, the rule seems to have been accepted by both sides, without inquiry as to its soundness under all circumstances.

In the assertion that reasonable and fair rates of return upon capital invested in public utilities depend upon practical elements and considerations and not upon legal formulae, we are sustained by *Wilcox* v. *Consolidated Gas Co.*, 212 U. S. 19 and *Northern Pacific R. Co.* v. *North Dakota*, 216 U. S. 579, as interpreted in *Public Service Co.* v. *Public Utility Board*, cited. As value depends upon earnings as well as upon the investment and is generally indicated by dividends paid on the stock, such dividends cannot be ignored in the fixing of the rate. As a practical proposition, a return large enough to provide for depreciation, interest on money borrowed and put into the business and five, six, seven or eight per cent. on the value of the stock, as shown by the difference between the estimated value of the property and the indebtedness, is reasonable and fair, but an allowance beyond that is unreasonable and unjust to the consumer. All the circumstances considered, I think an increase of rates so as to make them yield $15,000.00 or $20,000.00 of additional income could have been sustained but I think an allowance of $30,000.00 of additional income was clearly unreasonable. An excess of $10,000.00 per year in the return of

upon a $1,000,000.00 property is relatively small, but the test is not the extent of unreasonableness in the rates. Any at all, provided it is substantial, vitiates the rate.

*Order of Public Service Commission suspended.*