## In Re Guilford Water Company.

Piscataquis.    Opinion December 1, 1919.

*Right of Public Utilities Commission to inquire into, revise and regulate rates of service for water companies or other public service corporations, even though certain definite contracts for said service are then in force. General rule as to the right of the State to regulate the charges of public service corporations, and also right of State to alter, change or revise contracts or agreements entered into by said public service corporations.*

Having been authorized by the Legislature to "contract for a supply of water for fire or other purposes for a term of years," the town of Guilford, in the year 1910, entered into an agreement with the Guilford Water Company whereby, among other things, the latter stipulated that, for a period of twenty years from that time, it would furnish water for domestic purposes to dwellers in Guilford village, at an annual first faucet rate of $6.00.

Without legislative permission, the Water Company soon afterward agreed with another company that, for an annual payment of $300.00, it would function successively with the latter in providing a public service in the nearby village of Sangerville,—the one to collect and furnish a supply of water, and the other to distribute and sell it. Later on, the Legislature gave leave to the one company to supply the other, at a rental, proportional within defined limits, to the number of faucets and hydrants in the respective towns, but the companies never have changed the terms of their original agreement.

After supplying water to individual takers, in conformity to its contract with Guilford, for somewhat more than one-third of the stated term, the Guilford Water Company petitioned the Public Utilities Commission to approve and allow a revision of rates uniformly increasing the charge for the first faucet from $6.00 to $8.00. The town in its corporate capacity, and citizens in their own behalf, protested that such increase would be in violation of a valid contract. Moreover, they insisted that the rental or charge against the Sangerville Company should be increased.

Upon hearing and investigation, an increase of faucet rate was granted, less in amount than applied for. The Commission ruled, that though inadequacy of compensation for water supplied the Sangerville Company was patent, yet it was powerless to say what sum that Company rightly should pay to the other

On exceptions to this court, the town, renewing its attack, contended that as to private takers, the contract rates were controlling; and that the Commission had power to determine what quantity of money the Sangerville Company should pay for its supply.

*Held:*

That the State, as an attribute of sovereignty, is endowed with authority, in the appropriate exercise of the police power, to regulate the charges of public utilities. Regulation in such cases is not an unwarranted interference with the right of contract which the constitutional guaranty of the enjoyment of liberty includes. Private contracts, concerning property rights, are inviolable, but no obligation of a contract can extend to the defeat of legitimate governmental power. Contract rights, which affect the public safety and welfare, must yield to that which is essential to the general good. The Legislature, in the exercise of the police power, is unrestricted by the provisions of contracts between individuals or corporations, or between individuals and municipal corporations.

The State may decrease or increase the contract specified rates for public utility services as justness and reasonableness may require. Underlying such right of regulation is the fundamental doctrine that the utility for the adequate doing of that which it was chartered to do, should receive tolls sufficient to enable it to meet the exacted requirement. Rates neither should be so low as to deprive the utility of means of appropriately discharging duty nor so high as to unduly burden the public. Safe and efficient service, with substantial equality of treatment in like situations, is the essential.

In creating the Public Utilities Commission, the Legislature conferred upon that body powers of great scope, and imposed upon it great responsibilities. Subject to review on questions of law, the Commission has authority, inclusive of quasi-legislative and quasi-judicial power, to fix rates for all public utility services.

This determination is not repugnant to the proviso of Section 34 of the Utilities Act respecting contracts existent January 1, 1913, but interpretation of that proviso is not involved here. The question of the presented case is, not whether there shall be discrimination concerning first faucet rates in Guilford, but whether all such rates uniformly shall be increased, the contract notwithstanding.

With reference to the supply of water to the Sangerville Company, the unjust discrimination clause of the statute is of consequence. The existing arrangement between the two corporations never has enjoyed the approval of the State. The Guilford Company may not rightfully supply the Sangerville Company on any other than the statutory terms. It is the duty of the Public Utilities Commission to see to it that the statute is observed.

The first exception of the remonstrants is overruled. Their second exception, that relative to the ruling respecting the amount paid by the Sangerville Water Supply Company to the Guilford Water Company is sustained. The clerk of the Law Court will so certify to the clerk of the Public Utilities Commission,

Exceptions under R. S., Chap. 55, Sec. 55, from the ruling and findings of Public Utilities Commission. Judgment in accordance with opinion.

Case stated in opinion.

*Hudson & Hudson*, for town of Guilford.

*J. S. Williams*, for Guilford Water Company.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, DUNN, MORRILL, WILSON, DEASY, JJ.

DUNN, J.   The corporation of the Guilford Water Company owes its existence to a charter specially granted in the year of 1909. P. & S. L., Chap. 226.   Its powers were broadened by an act of 1911. P. & S. L., Chap. 249.   So far as relevant to the issues of this case, the original grant of authority limited the Company to conveying to and supplying the inhabitants of the town of Guilford "with water for all domestic, sanitary, municipal, and commercial purposes."   The town was empowered "to contract with said corporation for a supply of water for fire or other purposes for a term of years, and at the expiration of such contract to renew or change the same."

On August 10, 1910, the Water Company and the town entered into a written agreement, whereby the Company obligated itself, for the period of twenty years then next ensuing, to construct, maintain and operate a system of water works, for the purposes, in brief:

(a)   of constantly providing, at hydrants in certain of the public streets in Guilford, enough water for the protection of property against loss or damage by fire;

(b) of furnishing to the inhabitants of Guilford dwelling in the village, "a sufficient supply of pure water for domestic purposes on the following terms and rates:   Six dollars per year for the first faucet for each family.   .   .   .   ."

When that agreement was made, the works of the Guilford Company already were in process of construction.   About two months later, by promotion of the contractor installing the Guilford system, a corporation was formed under the provisions of the general incorporation statute, to supply water to the nearby village of Sangerville, in the town of that name.   For convenience, this corporation, organized as the Sangerville Water Supply Company, will be referred to as the Sangerville Company.   Its main extends to the stand-pipe of the

Guilford Company. From the beginning, (though for a time going beyond the extent of rightful corporate power,) the two companies have functioned successively in providing a public service in Sangerville,—the one, collecting and furnishing a supply of water,—and the other distributing and selling it. For the supply, the Guilford Company invariably has charged the Sangerville Company $300.00 a year.

In 1911, the Guilford Water District was chartered by the Legislature to acquire by purchase the property owned by the Guilford Water Company, and used by the latter in supplying water to Guilford. P. & S. L., 1911, Chap. 201. The charter imposed, that the District assume and carry out all then existing authorized contracts of the Guilford Company, and extended permission to furnish water to the Sangerville Company at a rental, proportional within defined limits, to the number of faucets and hydrants in the respective towns. The District never was organized. At the same session, the Legislature invested the Guilford Company with right to supply water to the Sangerville Company "according to the terms and conditions set out in the charter of the Guilford Water District." P. & S. L., 1911, Chap. 249.

After supplying water, in conformity to its contract with Guilford, for a period extending over somewhat more than one-third of the stated term, the Guilford Company petitioned the Public Utilities Commission to approve and allow a revision of rates, uniformly increasing the annual charge for the "first faucet" from $6.00 to $8.00. The town of Guilford, and individual citizens of that town, remonstrated that such increase palpably would be in violation of a valid contract. They contended that the Commission could neither order nor permit it. Moreover, they argued that the amount of the rental or charge against the Sangerville Company should be made greater. Following hearing, and upon extensive investigation, the Utilities Commission granted an increase of faucet rate, less in amount than applied for. With regard to the charge for the Sangerville supply, the Commission held, that though inadequacy of compensation was manifest, yet it was powerless to regulate what sum the one company rightly should pay to the other. The case is here on exceptions by the town of Guilford. Renewing its attack, the town emphatically asserts: (1) that in view of the contract the Commission cannot, either directly or by acquiesence, sanction any change in the rates therein set out; (2) that the Commission had

plenary power to determine what quantity of money should be paid by the Sangerville Company to the Guilford Company for water to be supplied the former by the latter.

That the State, as an attribute of sovereignty, is endowed with authority to regulate the rates of charges of Public Utilities, is past dispute. *Munn* v. *Illinois*, 94 U. S., 113; *Home Teleph. & Teleg. Co.* v. *Los Angeles*, 211 U. S., 265; *Minnesota Rates Cases*, 230 U. S., 352. It acts, in such connection, either immediately through legislative act or mediately through a subordinate body, in the exercise of the police powers; those powers which "are nothing more or less than the powers of government inherent in every sovereignty, . . . . the power to govern men and things." License Cases, 5 How., 583; *Veazie* v. *Mayo*, 45 Maine, 560; ·*B. & M. R. R. Co.* v. *County Commrs.*, 79 Maine, 386; *Skowhegan* v. *Heselton*, 117 Maine, 17. That there is a power, which has never been surrendered by the States, in virtue of which they may ,within certain limits, control everything within their respective territories, and upon the proper exercise of which, under some circumstances, may depend the public health, the public morals, or the public safety, is conceded in all the cases. *New Orleans Gas Light Company* v. *Louisiana Light &c. Co.*, 115 U. S., 650. Regulation in such cases is not an unwarranted interference with the right of contract which the constitutional guaranty of liberty includes. Private contracts, concerning property rights, are inviolable. Con. U. S., Art. 1, Sec. 10; Con. of Maine, Art. 1., Sec. 11. The constitutional inhibitions do not go to contracts touching governmental functions. *Stone* v. *Mississippi*, 101 U. S., 814. No obligation of a contract can extend to the defeat of legitimate governmental power. *Legal Tender Cases*, 12 Wall., 457; *Stone* v. *Mississippi*, supra; *Butchers' Union Company* v. *Cresent City Company*, 111 U. S., 746; *Chicago, Burlington & Quincy R. Co.* v. *Nebraska*, 170 U. S., 57. Contract rights, which affect the public safety and welfare, must yield to that which is essential to the general good. *Union Dry Goods Company* v. *Georgia Public Service Corp.*, 248 U. S., 372. In *Atlantic Coast Line R. R. Co.* v. *Goldsboro,* 232 U. S., 548, it is said: "Neither the 'contract clause' nor the 'due process' clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by

express grant; and that all contract and property rights are held subject to its fair exercise." The Legislature, in the exercise of the police power, is unrestricted by the provisions of contracts between individuals or corporations, or between individuals and municipal corporations. *Manigault* v. *Springs*, 199 U. S., 473.

The rule is general, that every contract touching matters within the police power, must be held to have been entered into with the distinct understanding that the continuing supremacy of the State, if exerted for the common good and welfare, can modify the contract when and as the benefit of that interest properly may require. While not competent for the State entirely to abandon the highly important governmental function of regulating public service rates, nevertheless, it temporarily may suspend exercise of the power. It has been settled that a state may authorize one of its municipalities to establish, by an inviolable contract, the rates to be charged, for a definite term, not unreasonable in point of time, by a public utility. *Home Teleph. & Teleg. Co.* v. *Los Angeles*, supra; *Detroit* v. *Detroit Citizens' Street Ry. Co.*, 184 U. S., 368, 382; *Vicksburg* v. *Vicksburg Waterworks Company*, 206 U. S., 496, 508; *Minneapolis* v. *Minneapolis Street Ry. Co.*, 215 U. S., 417. But the authority to make such contract must be expressly and specifically bestowed. It is beyond the recognized general powers of a municipal corporation to make that kind of a contract. Doubts must be resolved in favor of the continuance of the governmental prerogative of regulating rates and charges. *Railroad Commission Cases*, 116 U. S., 307, 325; *Freeport Water Company* v. *Freeport*, 180 U. S., 587; *Rogers Park Water Company* v. *Fergus*, 180 U. S., 624; *Knoxville Water Company* v. *Knoxville*, 189 U. S., 434; *Union Dry Goods Company* v. *Georgia Public Service Corp.*, supra; *City of Englewood* v. *Denver & South Platte Ry. Co.*, 248 U. S., 294. Exoneration from state control is neither to be presumed nor implied. The grant, or, what is equivalent thereto, the ratification, must be in express and not to be mistaken terms. It is only when the right is very clearly conferred that the State will be held to have relinquished the power to regulate rates. *Chicago, M. & St. P. Ry. Co.* v. *Minnesota*, 134 U. S., 418, 456; *Stanislaus County* v. *San Joaquin Company*, 192 U. S., 201; *Home Teleph. & Teleg. Co.* v. *Los Angeles*, supra; *Milwaukee Electric &c. Co.* v. *Railroad Com.*, 238 U. S., 174. In *Georgia Railroad Co.* v. *Smith*, 128 U. S., 174, the Legislature chartered a railroad and authorized it to charge rates of fare "not exceeding"

certain specified sums. The contention of the company that thereby it was exempted from legislative interference with its rates within the designated limits for all time, was rejected. The court said: "To effect this result, the exemption must appear by such clear and unmistakable language that it cannot be reasonably construed consistently with the reservation of the power (i. e., the power to regulate rates) by the state." The general provision in a railroad company's charter that it may make all needful rates, regulations, and by-laws touching the rates of toll does not constitute an irrepealable contract with the company that it shall have the right for all future time to prescribe the rates of toll free from legislative control. *Chicago, M. & St. P. R. Co.* v. *Minnesota*, supra. Speaking for the court, in *Englewood* v. *Denver, &c. Ry. Co.*, supra, where it was contended that the matter of rates of fare in controversy was unalterably embraced in a contract between the town and the company, Mr. Justice Holmes said: "clearer language than can be found in the state laws and this ordinance must be used before a public service is withdrawn from public control."

In the case at bar, the State did not directly surrender the regulatory power. It gave to the Company authority to supply Guilford with water for all domestic, sanitary, municipal, and commercial purposes, with all the rights and privileges and subject to the liabilities and obligations of similar corporations under the general laws. That is all. Nor did the State indirectly surrender the power of regulating rates and charges. It gave leave to the town to contract for a supply of water. Nothing was said about the regulation of rates. This legislation is in line with, and not of greater efficacy then, that of the general statute. R. S., Chap. 4, Sec. 63. The permission, as granted to the one or the other, if by any implication it related to the fixing of service rates, was not greater than that of a mere license revocable at the will of the Legislature. Previous decisions of this court are not at variance with this conclusion. In *Robbins* v. *Railway Company*, 100 Maine, 496, a case invoked by the remonstrants, the issue was between a public service corporation and its customer. As between them it was held, in the face of a contract, that the Company could not raise its rates. The right of the State itself, under reserved powers, was not there involved. *Belfast* v. *Water Company*, 115 Maine, 234, was a controversy between the city and the Company, the latter having attempted to repudiate its contract. It was held,

(a) that the defendant, by virtue of having received the benefit from the contract, was estopped from making such a claim; and (b), that ultra. vires is a defensive proposition. Said Chief Justice SAVAGE: "We are not 'called upon to consider now whether the State has reserved authority to regulate and control the terms and conditions of service. The State has not yet undertaken to do it in this case. The State so far has said only that the parties might contract on such terms as they might agree upon." In the instant case, the court is called upon to consider the reserved power which Judge SAVAGE stated was not involved when he wrote.

We do not mean to be understood as saying that the Guilford Company, at its will, could disregard the contract and exact higher charges; or that the town, at its pleasure, might contemn the rates appointed there. But, that the contract is subject to state restriction, and to regulation in the interest of the general public. Decisions, in *Detroit* v. *Detroit Citizens' St. Ry. Co.*, supra, and like cases, holding contracts valid as between the parties, are not opposed to this view. *Milwaukee El. Ry. & Lt. Co.* v. *Railroad Com.*, 238 U. S., 174. The State, in its supervisory sway, may interpose to decrease or increase the specified rates as justness and reasonableness may require. *Union Dry Goods Co.* v. *Georgia Public Service Corp.*, supra; *City of Englewood* v. *Denver &c. Ry. Co.*, supra. Underlying such right of regulation is the fundamental doctrine that the utility, held imperatively, for the preservation of the welfare of the community, to the adequate doing of that which it was chartered to do, for service so performed should receive tolls sufficient in amount to enable it to meet the exacted requirement. Rates neither should be so low as to deprive the utility of means of appropriately discharging duty nor so high as to unduly burden the public. *Winfield* v. *Public Service Com.*, (Ind.), 118 N. E., 531. Safe and efficient service for the public, with substantial equality of treatment in like situations, is the essential. The basic principles of the law of public utilities therefore require, that the rates should provide the utility an equitable reward on its investment devoted to a public use. *Knoxville* v. *Knoxville Water Company*, 212 U. S., 1; *Cedar Rapids Gas Company* v. *Cedar Rapids*, 223 U. S., 655; *Northern Pacific Ry.* v. *North Dakota*, 236 U. S., 585. "The rate shall be reasonable and just, taking into due consideration the fair value of all its property with a fair return thereon." R. S., Chap. 55, Sec. 16. The contract between. Guilford and the Water

Company, being a matter of public concern, must be held to have been made in expectation of the possible subsequent exercise by the State of its right to regulate the service rates. "From the very nature of their subject matter," succinctly and correctly states a writer in a recent number of the Harvard Law Review, (November 1918), "all contracts relating to public service entered into between the private person or corporation operating a public utility and the municipality and the private consumer contain an implied reservation of the right of the State lawfully to exercise its police power for the general welfare," citing numerous cases. Nor has the State ratified the doing of what was not at first authorized. Upon the Water District it enjoined that, if organized, it should become responsible for the performance of contracts valid against the Company when the District charter was granted. As the District has not been organized, it is unnecessary to inquire whether there were or not any contracts good in law.

Thus far we have considered the case from the view point of a direct act of the Legislature. There was no such act. In 1913, the Legislature created the Public Utilities Commission. That Commission, with powers of great scope and amplitude, and also with great responsibilities, partially changed the Guilford contract. Shall the legislation that called the Commission into existence be construed as effective both retroactively and prospectively? That a statute shall not have retrospective operation unless its terms are so strong, clear and imperative that no other meaning can be annexed to them, or unless the intention of the Legislature cannot be otherwise satisfied, is settled in an unbroken line of this court's decisions, so familiar they need not be cited. "Every public utility," to repeat from the statute now under consideration, "is required to furnish safe, reasonable and adequate facilities." R. S., Chap. 55, Sec. 16. About this positive expression of the public will, all the other legislative declarations collect together. "The rate, toll or charge—shall be reasonable and just, taking into due consideration the fair value of all its property with a fair return thereon, . . . ." "Every unjust or unreasonable charge for such service is hereby prohibited and declared unlawful." Idem. "The commission shall have authority to inquire into the management of all public utilities" (Section 4); to "fix a reasonable value upon all the property of any public utility—whenever it deems a valuation thereof to be necessary

for the fixing of fair and reasonable rates" (Section 36); if any "rates, tolls, charges, schedules or joint rates shall be found to be unjust, unreasonable, insufficient, or unjustly discriminatory, or otherwise in violation of the provisions of this chapter— the commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just and reasonable" (Section 46). To what end is the commission clothed with authority to inquire into the management of all public utilities? To see to it that safe, reasonable, and adequate facilities are furnished at fair and reasonable rates. New rates may be substituted for old; for, reads the statute, "if any rates shall be found to be unjust, unreasonable, insufficient, or unjustly discriminatory . . . ," the commission shall establish other regulations. This language is not uncertain. It does not leave the reader's mind to fluctuate between two meanings. It clearly is of broad application. It comprises "the management of the business of all public utilities," (R. S., Chap. 55, Sec. 4) and "any rates . . . or charges . . . . found to be unjust, unreasonable, insufficient, or unjustly discriminatory. . . . ." R. S., Chap. 55, Sec. 46.

It is our decision that, subject to review on questions of law, the Public Utilities Commission has authority, inclusive of both quasi-legislative and quasi-judicial power, to fix rates and charges for all public utility services. This determination is not repugnant to the proviso of Section 34 of the Utilities Act reading:

"nor shall the furnishing by any public utility of any product or service at the rates and upon terms and conditions provided for in any contract in existence January first, nineteen hundred thirteen be construed as constituting a discrimination, or undue or unreasonable preference, or advantage within the meaning specified."

But interpretation of that clause is not involved in this case. The question here presented is, not whether there shall be discrimination concerning first faucet rates in Guilford, but whether all such rates uniformly shall be increased, the contract notwithstanding. As to this, the proviso certainly is without application.

With reference to the supply of water for the Sangerville Company, the unjust discrimination clause of the statute is of consequence. The Guilford Company, though it came into being solely to furnish water in Guilford, at once proceeded to provide water for the Sangerville Company. The existing arrangement between the two corpora-

tions never has enjoyed the approval of the State. When the State authorized these companies to contract it said they could do so "according to the terms and conditions set out in the charter of the Guilford Water District." P. & S. L. 1911, Chap. 249. Those terms and conditions are: "the terms of said contract shall be based upon the expense incurred at Bennett Pond from which said water is taken and the expense in laying the main pipe from said pond to the stand-pipe and the cost of maintenance of the works at the pond, the main line and said stand-pipe. Of all this expense, said Sangerville Water Supply Company in its rental is to pay its proportional part based on the number of faucets and hydrants in each town." P. & S. L., 1911, Chap. 201. The rental of the Sangerville Company is not so based. But it ought to be. The Guilford may not rightfully supply the Sangerville Company on any other than the statutory terms. It is the duty of the Public Utilities Commission to see to it that the statute is observed.

The first exception of the remonstrants is overruled. Their second exception, that relative to the ruling respecting the amount paid by the Sangerville Water Supply Company to the Guilford Water Company, is sustained. The clerk of the Law Court will so certify to the clerk of the Public Utilities Commission.

*Exception sustained.*