[S. F. No. 12070. In Bank.—September 26, 1927.]

SUTTER BUTTE CANAL CO. (a Corporation), Petitioner, v. THE RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[1] POLICE POWER—CHARACTER AND EXTENT OF CONTRACTS.—The police power is one of the attributes of the state sovereignty and cannot be limited by contract. It operates upon property and property rights, including contracts, to the extent necessary for the protection of the public health, safety, morals, and welfare.

[2] ID.—PUBLIC UTILITIES—JURISDICTION OF RAILROAD COMMISSION.— To the Railroad Commission has been committed the execution of the police power over public utilities in California.

[3] ID.—EXERCISE OF POWER BY RAILROAD COMMISSION—REVIEW OF ACTION BY COURTS.—The exercise of the power conferred by section 23 of article XII of the constitution and sections 31 and 32 of the Public Utilities Act upon the Railroad Commission may be reviewed by the court only in the manner specified by the statute, and the review cannot be extended further than to determine whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the state of California; and the findings and conclusions of the Commission on questions of fact, including determinations on reasonableness and discrimination, are final and not subject to review.

[4] ID.—REVIEW PROCEEDINGS—PARTIES.—The Commission and each party to the action or proceeding before the Commission have the right to appear in the review proceeding.

---

1. See 5 Cal. Jur. 687, 688; 6 R. C. L. 183, 199.
3. See 22 Cal. Jur. 32.

[5] ID.—WATER CONTRACTS—POWER OF RAILROAD COMMISSION TO ABROGATE — FIXING OF RATES — CONSTITUTIONAL LAW. — It is well within the regulatory power of the Railroad Commission to disregard altogether the contracts of water users with a public utility company in so far as they provide for a period of future service and .to fix a present rate for water actually consumed in order to remove discrimination between contract users and noncontract users of the water; and such action on the part of the Railroad Commission does not violate any constitutional right of the company under the contracts.

[6] ID. — CONTRACT AND NONCONTRACT CONSUMERS — PROCEEDING TO ELIMINATE DISCRIMINATION—EFFECT OF CONTRACTS.—In a proceeding by the Railroad Commission to fix rates of a public utility water company so as to make a uniform rate and remove discrimination as between previous contract consumers and noncontract consumers, the objection cannot be maintained that the contract still binds the water company, and as to these contract holders it must stand ready to serve the whole acreage therein mentioned and may not safely take on additional consumers for that reason.

[7] ID.—DEDICATION OF WATER SERVICE—DUTY TO SERVE—CONTRACTS. Where a company has made a dedication of water service for certain land, the corresponding duty to serve is neither greater nor less by reason of continuous use contracts which it has made with certain consumers.

[8] ID.—FIXING RATES—VALUATION OF PROPERTY—DONATIONS BY LAND OWNERS.—In a proceeding by the Railroad Commission to fix water rates of a public utility water company, there is no error in excluding from the rate base an item donated by land owners toward the cost of a certain extension of the system.

[9] ID.—DECISION OF COMMISSION—EVIDENCE—POWER OF COURT TO REVIEW.—Where there is sufficient legal evidence found in the record to sustain the Railroad Commission's order, it is not within the power of the court to interfere with it.

[10] ID.—RATE OF RETURN—WHEN NOT CONFISCATORY.—In this proceeding it is held that it cannot be said, as a matter of law, that the rate of return is so low as to be confiscatory.

---

(1) 12 **C. J.**, p. 912, n. 57.    (2) 40 **Cyc.**, p. 836, n. 55.    (6) 40 **Cyc.**, p. 833, n. 33.

5. Power of state to change contract rate, notes, 9 **A. L. R.** 1423. See, also, 26 **Cal. Jur.** 474; 22 **Cal. Jur.** 67. Effect of contract with patrons to preclude regulation of rates of public service corporation, note, **L. R. A.** 1915C, 282.

7. See 26 **Cal. Jur.** 444, 482, 483.

9. See 26 **Cal. Jur.** 508.

10. See 22 **Cal. Jur.** 68.

APPLICATION for a Writ of Certiorari to review an order of the Railroad Commission fixing water rates of a public utility.   Order affirmed.

The facts are stated in the opinion of the court.

Isaac Frohman, Devlin & Brookman, W. H. Carlin and Henry Ingram for Petitioner.

Carl I. Wheat, Arthur T. George and Reginald L. Vaughan for Respondent.

Elmer W. Armfield and Arthur B. Eddy for Sutter Butte Water Users Association.

PRESTON, J.—By this proceeding petitioner seeks to have reviewed and annulled a decision and order of the Railroad Commission, designated decision No. 16289, made on March 20, 1926, relating to its water rates, complaint being made of the valuation of its property for rate-fixing purposes, the rate of return thereon and the modification and practical abrogation of certain continuous contracts for the furnishing of water held by it with a certain class of consumers.

In previous decisions this court has had occasion to outline the history of petitioner as a public utility engaged in the business of appropriating water from the Feather River and selling and distributing the same for irrigation purposes in Butte and Sutter Counties, in this state, and reference is made to the statements of fact set forth therein (*Butte County Water Users Assn.* v. *Railroad Com.*, 185 Cal. 218 [196 Pac. 265], *King* v. *Railroad Com.*, 190 Cal. 321 [212 Pac. 200], and *Live Oak Water Users Assn.* v. *Railroad Com.*, 192 Cal. 132 [219 Pac. 65]).

Petitioner, a public utility, admittedly subject to the power of the Railroad Commission, is in possession of a water right dedicated to the public use. Its consumers are divided into two classes—contract consumers and noncontract consumers. Water was originally furnished to the contract consumers under so-called "Water Right Contracts," or continuous supply contracts, whereby the consumer paid an initial amount, usually $10 per acre, for the

privilege of obtaining the contract, and agreed to pay a stipulated rate for irrigation water service each year thereafter upon the total acreage covered by the contract, and the company on its part agreed to furnish water as required for all of the acres covered thereby. Noncontract consumers, or applicants, pursuant to order of the Commission made in March, 1918, were served upon the basis only of applications for water made from year to year. This dual situation has existed since 1918 and the Railroad Commission has attempted to solve the problem presented by these two classes of consumers by various orders and decisions, the last two of which, the one here involved and the one prior thereto, may be briefly described as follows:

Decision No. 14422, rendered on December 31, 1924, after application by petitioner for a further increase in the water rates, increased the 1922 rates and abolished the differential in rates between contract and noncontract holders. It established a standby or service charge of $1.25 per acre, payable by both classes, effective as to noncontract holders for all of their lands covered by their applications during such time as they should continue on thereunder, and in any event for not less than three years, and to be continuously effective as to contract holders for all of the lands covered by their contracts, provided, however, by rule 3, that if such contract holder does not desire to use in any year the whole or any of said water which he is so entitled to receive, and "files with the company on or before February 1st of that year notice in writing of what he does desire in respect to the non-service of water, he shall then be obligated to pay in that year, and in each year thereafter in which said notice remains in effect, on or before February 1st thereof, the service charge of $1.25 per acre of the land for which no water is desired as specified in said notice, and, as to the remainder of his land, such rates or charges based upon the extent and character of use of the water which he desires to use, as are in effect."

Thereafter, and in 1925, the proceeding which resulted in decision 16289, the validity of which is here involved, was "instituted on the Commission's own motion for the purpose of making a complete and new investigation of the rates, charges, classifications, contracts, rules, regulations and service of the Sutter Butte Canal Company, in view of the de-

velopment of considerable protest and dissatisfaction following the fixing of rates on the Sutter Butte Canal Company system by this Commission in Decision No. 14422 dated December 31, 1924.''

Said decision modified the previous rules so as to give to each continuous contract holder the right, at his option, either (1) to obtain water under applications for so much of his land as he desired to irrigate, similarly with applicants generally who were not holders of continuous contracts; or (2) to obtain water under his continuous contract, provided that if he so elects, he may still, by notifying petitioner that he does not desire ''to use in any year the whole or any of the water which he is so entitled to receive, and files with the Company on or before February 1st of that year notice in writing of what he does desire in respect to the non-service of water, he shall then be obligated in that year, and in the next succeeding year thereafter, but for no further period in which said notice remains in effect to pay, on or before February 1st thereof, the service charge of $1.25 per acre of the land for which no water is desired, as specified in said notice . . . ''; or (3) to release himself from any obligation to pay any charge to petitioner under his continuous contract by giving notice that he does not desire any water for his land in any year, or to neither give notice nor use the water.

The substance of the order here under consideration is to pave the way for the release of all contract consumers. It is true that the contracts may be retained at the election of the consumer but the whole plan is in reality, when stripped of its complications, an effort by the Railroad Commission to abolish all distinction between the two classes of consumers and to put them upon a parity in order that there may be removed from the controversy this source of friction and trouble.

The Commission in this behalf, among other things, said: ''Rates fixed herein will, therefore, be on the basis that all service be charged for under a unifrom schedule of rates and under application forms which will exclude any consideration of the continuous contract and preclude the making of charges for unirrigated lands under said contracts, as such.''

[1]    The controlling question in the proceeding is, there-fore, the extent of the power that may be exerted by the Railroad Commission upon the contracts between petitioner and the contract consumers. The police power is one of the attributes of state sovereignty and cannot be limited by contract. It operates upon property and property rights, including contracts, to the extent necessary for the protection of the public health, safety, morals, and welfare. [2] To the Railroad Commission has been committed the execution of this power over public utilities in California. The scope of this power is defined in the state constitution as follows:

Section 23, article XII: "Every private corporation, and every individual or association of individuals, owning, oper-ating, managing or controlling any . . . canal, pipe-line, plant or equipment, or any part of such . . . canal, pipe-line, plant or equipment within this state, . . . for the pro-duction, generation, transmission, delivery or furnishing of heat, light, water or power . . . either directly or indi-rectly, to or for the public . . . is hereby declared to be a public utility subject to such control and regulation by the Railroad Commission as may be provided by the legislature, and every class of private corporations, individuals, or asso-ciations of individuals hereafter declared by the legislature to be public utilities shall likewise be subject to such control and regulation. The Railroad Commission shall have and exercise such power and jurisdiction to supervise and regu-late public utilities, in the State of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the legislature, and the right of the legislature to confer powers upon the Railroad Commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution . . . " The powers conferred are more specifically set forth in sections 31 and 32 of the Public Utilities Act (Deering's Gen. Laws 1923, p. 2702).

[3]    The exercise of the power thus conferred upon the Railroad Commission may be reviewed only in the manner specified by the statute, which is in brief as follows: " . . . The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision

under review violates any right of the petitioner under the constitution of the United States or of the State of California. The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review; such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination. [4] The commission and each party to the action or proceeding before the commission shall have the right to appear in the review proceeding. Upon the hearing the supreme court shall enter judgment either affirming or setting aside the order or decision of the commission . . . " (Public Utilities Act, *supra,* section 67).

[5] The covenants of the contract here to be tested for the operation of the police power are as follows: That the canal company furnish water at the rate of one cubic foot per second for each 160 acres of land described in each contract for the purpose of irrigating the land. In cases where water is desired by the land owner, at his option, to be furnished by the canal company for producing rice, the contracts provide for the furnishing of water at the rate of three cubic feet per second for each 160 acres of land and at a higher charge per acre than is provided for water furnished for the production of crops other than rice.

That the water covered by the contract shall be and become appurtenant to the land therein described, and can only be conveyed by and with a conveyance of the land; that all the covenants and conditions of the contract shall run with the land; that the use of the water must be confined to said land.

That the land owner shall construct and maintain a ditch from the company's ditch to his land, which at the option of the canal company may be taken over and operated by it; that the land owner grants to the canal company a right of way through his land; that the land owner shall pay to the canal company the specified rate for each acre annually on September 1st of each and every year; that all sums due or to become due to the canal company under the contract shall be and become a lien on the lands described therein and may be foreclosed as any other lien; that the heirs, successors, and assigns of the respective parties are forever bound by the contract; that in case of water shortage each

land owner is to be entitled only to a proportional share of the water available; that it is understood that the canal company will contract for the delivery of 1,000 cubic feet of water per second. Where a lump sum was provided to be paid annually by the land owner, such sum was computed by multiplying the rate per acre by the number of acres described in the contract.

The power to increase the charges for service has been twice exercised by the Railroad Commission at the behest of petitioner as hereinabove pointed out. The times and terms of payment under said contracts have been changed by the same power. As far as the petitioner is concerned its privileges and emoluments under the contracts have been greatly increased. So far as the consumer is concerned, however, the contract has slight, if any, benefit to him left in it. The only privilege he has apparently is to sit by and see the eleventh hour consumer, who has no contract, served with water upon less onerous terms than he who has borne the burden during the trying periods of earlier days. For the contract consumer must pay a service charge on the whole acreage under contract for all lands described therein upon which water is not used in a given season, while the new consumer only has to apply for water for lands which he intends to irrigate and only has to pay the service charge thereon for the acreage which he does not actually irrigate. And he may satisfy all demands against him in three years, if not sooner, and be completely released.

In other words, the new consumer has a chance for the exercise of his judgment and discretion upon the situation as it arises, whereas without the order in question the contract holder is firmly bound, not for a space of time but perpetually, without a single opportunity to exercise judgment or discretion in his efforts to better his condition. He is condemned to pay, and that forever, the charge annually accruing, which is a lien upon his inheritance. If the Commission may not relieve this discrimination, then it must follow that since 1918 every new consumer has been illegally admitted to water service as such consumer was not required to sign a contract for perpetual service. For if the Commission may allow a dedication of service to a new consumer without demanding of him a perpetual obligation, then it must follow that it has the power to remove discrimination

thus created between the two classes of consumers. The legality of this dual classification has already been sustained by this court (*King* v. *Railroad Com., supra; Live Oak etc. Assn.* v. *Railroad Com., supra*). In these causes petitioner appeared and espoused the orders of the Railroad Commission. In fact, by a process originating in keen paternal interest, the Commission has heretofore devised many plans to aid petitioner, all of which have been executed at the expense of the contract consumer. The order here in question is the only one to which petitioner has or could have objected.

The power of the Railroad Commission is little indeed if it may not intervene to remove such palpable discrimination. The Commission has found that the time has arrived for this action. Practically the only provision of the contracts not modified already by this court is the one changing the duration of the contract. But it must follow that if, in fixing rates, or in removing discrimination, the duration of the contract relationship is encountered, it must yield to the regulatory power lodged by the constitution in the Commission, even to the extent of out and out termination or release of such contract.

Moreover, petitioner is in no position to urge that this conclusion is not correct, for it has on previous occasions successfully urged the Commission to fix constructive periods of time for which noncontract consumers must obligate themselves to pay in order to get water service. Three years is the period mentioned as to them in the order here under review. If it is within the power of the Commission to require a consumer to sign an agreement to pay for three years' service in order to get water for his present year's needs, it must surely be true that the power to add a constructive period to the obligation implies the power to curtail an indefinite period and thus place the two classes of consumers of the same utility on an equal basis. In other words, it is clear that it is well within the regulatory power of the Commission to disregard altogether the contracts in so far as they provide for periods of future service and fix a present rate for water actually consumed, and disregard all paternalistic provisions in favor of petitioner at the expense of either class of consumers. It follows logically then, that the order under review is not open to the criti-

cism that it violates any of petitioner's constitutional rights under the contracts. Any language found in the case of *Live Oak etc. Assn.* v. *Railroad Com., supra,* which may seem to be at variance with these views must be read in connection with the issue there involved, which was the validity of this dual classification among consumers of this utility and the right to charge against contract holders the service fee on the lands not irrigated. The power of the Commission to disregard the duration period of said contracts was not there involved.

The holding we here make as to the power to modify or abrogate said contracts in the manner done by the order under consideration has been clearly foreshadowed in the following cases: *Southern Pacific Co.* v. *Spring Valley W. Co.,* 173 Cal. 291, 298 [L. R. A. 1917E, 680, 159 Pac. 865]; *Limoneira Co.* v. *Railroad Com.,* 174 Cal. 232, 237, 238 [162 Pac. 1033]; *Live Oak etc. Assn.* v. *Railroad Com., supra; Leavitt* v. *Lassen Irr. Co.,* 157 Cal. 82, 93 [29 L. R. A. (N. S.) 213, 106 Pac. 404]; *Traber* v. *Railroad Com.,* 183 Cal. 304, 312 [191 Pac. 366]; *Law* v. *Railroad Com.,* 184 Cal. 737, 740 [14 A. L. R. 249, 195 Pac. 423]. Indeed, this identical question was before the supreme court of the state of Washington in the case of *Raymond Lumber Co.* v. *Raymond Light & Water Co.,* 92 Wash. 330 [L. R. A. 1917C, 574, 159 Pac. 133, 135–137], and the power of the Commission so to abrogate said contracts between the utility and its consumers was upheld.

In *Law* v. *Railroad Com., supra,* at page 740, it is said: "If the service contracted for was devoted to public use (*Allen* v. *Railroad Com.,* 179 Cal. 68 [8 A. L. R. 249, 175 Pac. 466]), the contract for the service was subject to the exercise of the police power and, the state having elected to confer upon the commission the power to prescribe uniform rates for the service, petitioner cannot complain if the exercise of its power results in the practical annulment of his private contract fixing compensation for a public service. (*Producers' Transp. Co.* v. *Railroad Com.,* 251 U. S. 228 [64 L. Ed. 239, 40 Sup. Ct. Rep. 131, see, also, Rose's U. S. Notes Supp.].)"

In *Manigault* v. *Springs,* 199 U. S. 473 [50 L. Ed. 274, 26 Sup. Ct. Rep. 127], this principle is stated as follows: "It is the settled law of this court that the interdiction of

statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.''

In *Market St. Ry. Co.* v. *Pacific Gas & Electric Co.,* 6 Fed. (2d) 633, 635, it is said: ''On the question of the power of the state to regulate the contracts of its public utilities with their consumers the law is now well settled. 'The courts hold that all contracts relating to public service, entered into between the corporation operating a public utility and the private consumer, contain from the very nature of their subject-matter an implied reservation of the right of the state to lawfully exercise its police power for the general welfare, and that there is no impairment of the obligations of contract within the guaranties of the state or federal Constitution, even though said contract is thereby rendered partially or wholly invalid.' (*In re Guilford Water Company's Service Rates,* 118 Me. 367 [108 Atl. 446, 450]; *Union Dry Goods Co.* v. *Georgia Public Service Corp.,* 248 U. S. 372, 376 [9 A. L. R. 1420, 63 L. Ed. 309, 39 Sup. Ct. Rep. 117]; *Producers' Transp. Co.* v. *Railroad Com.,* 251 U. S. 228, 232 [64 L. Ed. 239, 40 Sup. Ct. Rep. 131]; *Arkansas Natural Gas Co.* v. *Arkansas Railroad Com.,* 261 U. S. 379, 382 [67 L. Ed. 705, 43 Sup. Ct. Rep. 387]; *Ogden Portland Cement Co.* v. *Public Utilities Com. of Utah,* 258 U. S. 609 [66 L. Ed. 788, 42 Sup. Ct. Rep. 381].)''

In *Union Dry Goods Co.* v. *Georgia Public Service Corp.,* 248 U. S. 372 [9 A. L. R. 1420, 63 L. Ed. 309, 39 Sup. Ct. Rep. 117, see, also, Rose's U. S. Notes Supp.], Mr. Justice Clarke, speaking for the court, concluded his examination of this subject with this observation: ''These decisions, a few from many to like effect, should suffice to satisfy the most skeptical or belated investigator that the right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the state. . . . ''

[6] It is no answer to this contention to say that the contracts still bind the petitioner and it must as to these contract holders stand ready to serve the whole acreage therein mentioned and may not safely take on additional consumers for that reason. It is not for this court to say how much strength, if any, remains in these pacts, but one thing we may say and that is that any contract consumer who elects to avail himself of the status of a noncontract consumer may not, if petitioner properly protests, return to his former status under the contract (*Law* v. *Railroad Com.*, *supra*, p. 741). [7] But a still more satisfactory answer to this contention of petitioner is the fact that, contract or no contract, dedication of water service has been made for these lands and the corresponding duty to serve is neither greater nor less by reason of the contracts. (*Leavitt* v. *Lassen Irr. Co.*, *supra*, p. 89; *Byington* v. *Sacramento Valley etc. Co.*, 170 Cal. 124, 133 [148 Pac. 791].)

[8] Petitioner also complains that the Railroad Commission excluded from the rate base an item of $309,000 donated by the land owners toward the cost of what is known as the Sutter County Extension. [9] Where there is sufficient legal evidence found in the record to sustain the Commission's order, it is not within the power of the court to interfere. (*Williamson* v. *Railroad Com.*, 193 Cal. 22, 35 [222 Pac. 803].) This situation is best described in the language of the Commission: "The effect of the construction of the Sutter County extension by the Company on the rates of the Sutter Butte Canal Company has been the subject of much controversy. It has been the belief of many of the land-owners in Butte County that this extension was entirely unjustified and that it has resulted in an extra and unreasonable burden on the water users in that county. Much testimony was introduced relative to this matter. It appears that in 1918 certain land-owners of Sutter County negotiated with this Company for a supply of water. In 1919, an agreement was entered into for the service of 14,400 acres by the construction of distribution laterals and the utilization of the Live Oak Slough for the conveying of water to this general territory. The cost of the construction was to be paid in full by the land-owners and later to be refunded on the basis of one-seventh of the annual revenue received. In 1920, it was found necessary to extend the main canal to this district and

discontinue the use of the Live Oak Slough.   A new contract was entered into whereby the land-owners were required to advance $20.00 per acre, while the Company agreed to complete the construction and install a pumping plant on Feather River.   The total cost of the project was approximately $825,000.00 and the Company's investment slightly over $526,000.00.   This work was done at the peak of prices and, in addition, was rushed so that without question the cost exceeded a reasonable cost under present conditions and some additional cost over normal construction occurred at the time of the development.   In past decisions, the amount of the rate base for this extension has been the amount invested by the Company.''

The Commission for the reasons indicated above excluded the item and allowed only the investment by the company. There is no contention that the evidence does not warrant the observations above quoted.   We see no ground upon which this court may intervene in such a situation.   The fact that the item has been consistently excluded in previous orders to which the petitioner made no protest convinces us that it has placed its chief reliance upon the questions above discussed and not upon this action of the Commission.

As to the further contention that the Commission arbitrarily refused to consider reproduction cost in its rate-fixing order, an examination of the record discloses that the Commission only had before it on that subject the testimony of the witness Ryan, who had admittedly used a number of uncertain assumptions which would render his estimate inaccurate and the Commission was well within its authority in determining that it could base no conclusion upon this testimony.   Of it the Commission said: ''An estimate of reproduction cost new totaling $2,676,118 was presented through Mr. Ryan.   This was based on the appraisal by Mr. Ware, applying price ratios with a view to determining the probable reproduction cost new under 1924 price conditions. This appraisal was of a very general nature and the evidence indicates a failure on the part of Mr. Ryan to take into consideration changes in the art of construction and the use by him of other general assumptions which would tend to give a figure in excess of reasonable.''   (27 C. R. C. 765, 773.)

The witness concerning his own testimony said: "This is not an attempt to make a reproduction valuation of the property, or show the cost of reproducing it, but only to convert the investment actually made into terms of dollars of 1925 levels." It is not a fair characterization to say the Commission arbitrarily refused to consider this factor. On the contrary, the Commission did consider the item of evidence and found it insufficient upon which to predicate action. The legality of the system of valuation employed is, therefore, not raised on this record.

[10]    Complaint is also made that the estimated rate of return on the valuation fixed is only 5.28 per cent. We are pointed to no figures which show this estimate to be above question as to its accuracy. Moreover, no consideration of the value of the service to the consumers is taken into account. Much proof was introduced to show that existing rates were in excess of the value of such service. In view of the many complications inhering in the system of operation of this utility, we are unable to say, as a matter of law, that the rate of return is so low as to be confiscatory.

It would seem that the Commission has been jealous of the rights of the petitioner and that the order in question may go far toward forming a better basis for solving the problems of all concerned and if discrimination results at any point from it, rectification by the Commission will no doubt ensue.

The order is affirmed.

Richards, J., Curtis, J., Langdon, J., Shenk, J., Seawell, J., and Waste, C. J., concurred.

Rehearing denied.