## CITY OF HAGERSTOWN *v.* PUBLIC SERVICE COMMISSION OF MARYLAND

[No. 172, September Term, 1957.]

102

104

*Decided May 23, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Edward Oswald, Jr.,* and *David W. Byron,* with whom
were *Lane, Bushong & Byron* on the brief, for the appellant.

*John C. Griffin, Special Counsel for the Public Service
Commission,* for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

The City of Hagerstown (the "City") appeals from an
order of the Circuit Court for Washington County entered on
July 29, 1957, which denied in part a petition for review of
rates fixed by an order of the Public Service Commission of
Maryland (the "Commission") dated July 10, 1957, revising
to some extent a previous order dated September 6, 1956, for

water furnished by the City to consumers outside of its cor-porate limits.

Two questions are presented: first, was it legally per-missible for the Commission to exclude from the rate base certain property of the City used or useful in the public serv-ice on the ground that such property had been donated to the City in whole or in part and should therefore be treated as contributions in aid of construction; and second, did the Commission fail to give adequate weight to the cost of repro-duction new, less depreciation, in finding the fair value of the City's property allocable to furnishing water to consumers outside of the City limits?

The factual background out of which this case arises is the familiar one of the development of industry and of the growth of residential communities in suburban areas. Demand for an adequate supply of water fit for human consumption is one of the inevitable concomitants of such development and growth. Some pertinent historical facts are set forth below.

In 1878 the voters of the City declined to authorize a bond issue for the purpose of constructing a municipally owned public water supply system. Soon thereafter a corporation known as the Washington County Water Company was formed. On May 31, 1881, it entered into a contract with the City to furnish water to the City and its inhabitants and the race between population growth and water supply went on for years, resulting in substantial increases in water supply storage capacity and in the distribution system. In 1918, pursuant to Chapter 58 of the Acts of that year (the "En-abling Act"), the City acquired the properties and contracts of the Water Company. It also acquired the problem of meeting demands for water, and the increase of the water supply and distribution facilities to meet expanding demand, of course, continued. In about 1940 or 1941 the City made its first major extension of service into a portion of Wash-ington County lying outside the City limits. Other county extensions have followed and in 1955 the City found itself faced with the need of making considerable further increases in its supply and distribution facilities, primarily to meet the increased suburban or county demand. The Enabling Act

authorized the City to furnish water to any person, firm, corporation or municipality in Washington County outside of the City's corporate limits.

From the time when it took over the system from the Water Company the City has fixed the rates to be paid by consumers, whether within or outside of its corporate limits. It has consistently maintained a differential between the two, charging a higher rate to county than to city consumers. The original Public Service Commission Law of Maryland, enacted in 1910, did not confer jurisdiction upon the Commission with regard to publicly owned water systems. Jurisdiction was conferred upon the Commission by Chapter 181 of the Acts of 1922, to fix or alter rates charged by a public body for water service supplied beyond its own boundaries, but only upon the written request of the public authorities of the other jurisdiction. Substantially the same provisions are contained in the 1957 Code, Article 78, Section 55, the first sentence of which reads as follows: "Upon written application of any county, sanitary district, or municipal corporation of this State, the Commission shall fix or alter the rates (and only the rates) for water supplied within the boundaries of the applicant by any other county or municipal corporation, as if the supplying subdivision were a water company." (The second sentence of this Section set forth exceptions not here relevant.) These proceedings were initiated before the Commission pursuant to this Section by the County Commissioners of Washington County, and three municipalities within that County, and various individuals and corporations receiving water service in the County from the City of Hagerstown intervened.

In or about November, 1955, the City proposed to increase its maximum rate to consumers outside the City limits from 36¢ to 60¢ per 1,000 gallons of water, but did not propose to change the maximum charge of 30¢ per 1,000 gallons to customers within the City. (The Commission has no jurisdiction over rates charged to City consumers.) The Commission's first order limited the increased county rate to 43¢; but as a result of an order of the Circuit Court for Washington County requiring the Commission to take into con-

sideration in fixing rates the cost of certain projects (useful to county consumers) actually or substantially completed, a maximum county rate of 45¢ was authorized by the Commission by its order dated July 10, 1957. This order also made a corresponding revision of the Commission's valuation of the City's water supply and distribution system allocable to its county service, and fixed that valuation as of December 31, 1956, at $1,228,465. This was a relatively small increase over the December 31, 1955, figure of $1,200,000 which had been fixed by the order of September 6, 1956. The net increase represented the cost of property additions, less the amount of increased accrued depreciation and less the amount of increased contributions in aid of construction. The $1,200,000 starting figure as of December 31, 1955, was based upon calculations made by officials of the Commission. It represented the cost of the County-use property less depreciation, amounting to a net figure of $1,252,545, minus contributions in aid of construction amounting to $271,277, leaving a net amount of $981,268, to which were added an allowance for working capital of $38,000, a further allowance of $8,632 for materials on hand, and an additional allowance of $172,100 apparently made as a result of the Commission's appraisal of the factor of reproduction cost.

In arriving at its valuation of the City's property allocable to its county water service, the Commission excluded entirely costs paid by others and not by the City for the installation of service. These are briefly described in the opinion of the Circuit Court as: "(1) the cost of water mains in various developments * * * paid for by the developers in order to secure city water service in their additions; (2) charges for fire hydrants and for connections; (3) the amount received from the Federal Government in connection with a certain W. P. A. water line project."

For the purpose of rate regulation under Section 55 of Article 78 of the Code (1957) the City is to be treated as if it were a water company within the meaning of Section 2 (ee) of that Article; and a water company is, of course, a public service company under 2 (o). The City then points to Sections 68, 69 and 72 of Article 78. The Commission

is authorized under Section 68 to determine just and reasonable rates of public service companies, and under Section 72 to "* * * investigate and ascertain * * * the fair value of the property of any public service company used and useful in rendering service to the public." The City's principal argument rests upon Section 69 which reads as follows:

> " 'Just and reasonable rates' means rates which are not in violation of any of the provisions of this article, and which will result in an operating income to the public service company, yielding, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return upon the fair value of the company's property used and useful in rendering service to the public."

The words which the City especially emphasizes are "a reasonable return upon * * * the company's property." These words, the City contends, are applicable to its property used and useful in the public service, no matter how acquired—whether by gift, contract or purchase.

The Commission's argument is founded upon the proposition that the customers of a public service company should not be called upon to pay rates which would yield a return to the company on property for which they or others, but not the public service company, have paid.

In the instant case, as we understand the facts, much of the property involved in this dispute was acquired by the City pursuant to agreements between the City and developers of real estate subdivisions, under which the developers paid all or part of the cost of mains and hydrants and of their installation and the City agreed to furnish water to the subdivisions. We think that it makes no difference, so far as this case is concerned, whether these payments were made in the first instance by the developers or by the purchasers of lots. We may observe in passing that we have no doubt that any such costs originally paid by the developers were passed on to the purchasers in the form of increased prices

for lots, and that the purchasers or their successors in interest are the persons who must pay the water rates.

None of the agreements under which the City acquired the contributed property is before us as an exhibit, and we understand that there was no standard form of such agreements. We think, however, that their general nature is sufficiently shown.

The present question has been before numerous commissions but relatively few courts. It has been before the Public Service Commission of Maryland, but has not previously been raised in any of the valuation cases in this Court. The first Commission case to deal with it appears to have been *Re Conowingo Power Co.* (1935), 10 P. U. R. (N. S.) 353, in which (at p. 359) the Commission said: "The contributions required of customers for extension of lines to serve them have resulted in the acquisition of property by the company which, the Commission holds, ought to be deducted from the base upon which the customers are required to pay the company a return. It seems obviously unfair to customers to require them to pay the same rate of return on the value of property which they have been required to contribute in order to get service as upon property which the company has itself provided."

Ten years later, in *Re Consolidated Gas Electric Light and Power Co.* (1945), 61 P. U. R. (N. S.) 94, the question was again raised. There the Commission said (p. 101): "There is, naturally, a limit to the amount which the company can invest to attach a certain class of customer without imposing an undue burden on the service as a whole, and a customer who requires more than that limit is required to pay the excess. * * * The property so created is included with other fixed capital which is subject to depreciation accrual and the cost of its maintenance is charged to operating expense. The company contends that it is entitled to a return on the amount of these customer investments in addition to all costs of operation and maintenance. That would treat the amount as an investment by the company instead of by customers and would burden the service to the full extent of a company investment and there would be no justification for the requirement of such

contributions. We think it is quite apparent that the amount of these customer contributions should be excluded from the rate base." The Commission made a similar determination in *Application of The Maryland Water Works Co.,* P. S. C. of Md. Reports, Vol. XLVII, pp. 64, 65 (1956).

The Commission, it will be noted, allowed the Company' in the *Consolidated* case rates which would cover depreciation and maintenance on the contributed property. Similar allowances have been made, we understand, in the instant case. Thus the question before us is whether the City may reap where it has not sown—or at least where it has not sown with its own seed.

Commissions of many other States have excluded contributions in aid of construction from the rate base of utility companies. The Commission has cited such holdings from some twenty-eight states, the District of Columbia, Hawaii and Alaska. The last of these was upheld in *Pichotta v. City of Skagway,* 78 F. Supp. 999, 1006 (D. C., Alaska).

In other cases in which the correctness of such rulings has been challenged in the courts, the exclusion from the rate base of contributions in aid of construction has been upheld. *Public Utilities Comm. v. East Providence Water Co.,* 48 R. I. 376, 136 A. 447; *Sutter Butte Canal Co. v. R. R. Comm. of California,* 202 Cal. 179, 259 P. 937; *City of St. Francis v. Public Service Commission,* 270 Wis. 91, 70 N. W. 2d 221.

The City seeks to distinguish and reject a number of the authorities relied upon by the Commission on the ground that the statutes upon which they rest require the fixing of just and reasonable rates, but do not require that such rates yield a reasonable return upon the fair value of the utility assets used or useful in the public service. This ground of distinction is not, however, persuasive, since States having such laws seem to adopt the view that in order to meet the test of being just and reasonable, rates must yield a reasonable return on the fair value of the utility's property. See *New Rochelle Water Co. v. Maltbie,* 288 N. Y. S. 82, 158 Misc. 752, (reversed on other grounds, 292 N. Y. S. 650, 249 App. Div. 378,); *New York, ex rel. Consolidated Water Co. of Utica v. Maltbie,* 275 N. Y. 357, 9 N. E. 2d 961, app. dis-

missed, 303 U. S. 158; *Atlantic City Sewerage Co. v. Board of Public Utility Comm'rs,* 100 N. J. L. 395, 125 A. 327; *Citizens Water Co. v. Penna. Public Utility Comm.,* 181 Pa. Super. 301, 124 A. 2d 123; *Petersburg Gas Co. v. City of Petersburg,* 132 Va. 82, 110 S. E. 533; *City of Huntington v. Public Service Comm.,* 89 W. Va. 703, 110 S. E. 192.

The subject of fair value and rate-making has been exhaustively reviewed by this Court in the comparatively recent cases of *C. & P. Telephone Co. v. Public Service Comm.,* 201 Md. 170, 93 A. 2d 249, and *Baltimore Transit Co. v. Public Service Comm.,* 206 Md. 533, 112 A. 2d 687. Those cases advert to the vicissitudes which the concept of "fair value" of the property of a utility company as the basis for fixing rates has undergone. It can hardly be said since the decision in *Federal Power Comm. v. Hope Natural Gas Co.,* 320 U. S. 591, that a finding of fair value as a basis for rate-making is any longer considered as an essential of due process under the Fifth Amendment, which was there involved, or under the Fourteenth Amendment, which governs State action. Be that as it may, the Maryland statute (Sec. 69 of Art. 78 of the Code, 1957) has expressly adopted the concept of fair value and requires that in order to be just and reasonable, rates must yield a reasonable return upon the fair value of a utility company which is used and useful in rendering service to the public. It is under our own statutes that we must decide this case.

We, of course, give weight to a long continued administrative construction of a statute, but we also recognize the limitation on the rule that such a construction cannot prevail against the clear language of the statute. *Smith v. Higinbothom,* 187 Md. 115, 48 A. 2d 754; *Comptroller v. M. E. Rockhill, Inc.,* 205 Md. 226, 107 A. 2d 93.

We may also observe that Section 69 of Art. 78 of the 1957 Code had no exact counterpart in our Public Service Commission Law prior to the enactment of Ch. 441 of the Acts of 1955, which completely revised the Public Service Commission Law. The provision requiring a reasonable return on fair value was written into our statutes by that Act, though it had been held to be implicit in the Maryland law

prior to the 1955 statute. See the *C. & P. Telephone Co.*
and the *Baltimore Transit Co.* cases, above cited. Though
it cannot be said that either the *Conowingo Power Co.* case
or the *Consolidated Gas Electric Light & Power Co.* case,
*supra,* decided, respectively, in 1935 or 1945, established an
administrative construction of the language of our present
statute, it seems that the 1955 recodification adopted the
general rule long established in this State of ascertaining fair
value and allowing a reasonable rate of return thereon and
also that it tacitly accepted the administrative practice adopted
in the *Conowingo* and *Consolidated* cases. There is no indi-
cation that what is now Section 69 of Art. 78 and the closely
related Sections 68 and 72 were intended to establish any
new or revolutionary method of rate-making.

The rationale of the Commission's exclusion from the rate
base of contributions in aid of construction in the instant case
and in the *Maryland Water Works Co.* case, *supra,* decided
shortly before the present case, and the rationale of the many
decisions of Commissions of other States reaching a like
result is, in essence, that it is inequitable to require con-
sumers to pay to the utility a return on property which they,
not the utility, have paid for. Such a result may be sup-
ported, not only as a matter of rather obvious fairness, but
also as a matter of perhaps somewhat technical theory, in
spite of the fact that the utility holds legal title to the con-
tributed property, on the ground that the contributed prop-
erty is subject to contractual rights in favor of those who
furnished it (treating a developer as if he were the agent of
those who buy lots served by the contributed facilities), which
place the beneficial use of the property in those who, from
time to time, own the lots, houses, factories or lands which
the water company (in this case the City) has agreed to
serve, so that the value of the water company's bare legal
title to the property is nothing. In other words, the water
company (here the City) is simply in the position of a trustee,
holding legal title to the contributed property for the benefit
of those with whom it has contracted, or their successors in
interest.

In such a view of the situation, *Board of Public Utility*

*Comm'rs v. New York Telephone Co.,* 271 U. S. 23, seems inapplicable. There, the facts that a utility company might have collected excessive charges from its customers and that it had invested some of the funds so collected in property used in its business, did not prevent the utility company from including property purchased with such funds in its rate base. The customers who had been overcharged had no interest in the company's property and no lien or contractual right which they could enforce against its property.

The Commission's action in excluding from the rate base contributions in aid of construction such as we are dealing with here, is not, in our estimation, a means of effecting the regulation of a utility under the guise of an accounting rule. We think that it is generally agreed that this cannot properly be done. See *Hills, Law of Accounting and Financial Statements* (1957), Section 1.11. Here the Commission has simply used a recognized system of accounting to aid in ascertaining an amount which it thought should be excluded from the rate base.

We find nothing unlawful or arbitrary in the exclusion from the rate base of the contributions in aid of construction here involved.

With regard to the question of the weight to be attached to reproduction cost new, we think that little need be added to what was said in the *Chesapeake & Potomac Telephone* case and in the *Consolidated Gas Electric Light & Power Co.* case, both above cited. The Commission is not tied to any one formula in ascertaining fair value; reproduction cost new, less depreciation, is one of the factors traditionally taken into consideration, but it is not necessarily controlling. Its weaknesses have been pointed out in many cases, but on this subject we need do no more than refer to the two recent decisions of this Court cited above.

There is much force in the argument of the City that the physical plant of a water company would be likely to be reproduced more nearly just like existing facilities than would be the case with other types of utility plants where technological advances and changes are more rapid. This argument is reinforced by the long estimated useful life of cast iron

pipe, which forms an important part of the value of a water supply and distribution system. However, it is clear that the Commission did take reproduction cost new, less depreciation, into careful consideration in arriving at the fair value of the City's property used and useful in the public service in the County area served, and it is also evident that it gave increased prices as applied to this factor considerably greater weight than it did in the *Chesapeake & Potomac Telephone* case and the *Baltimore Transit Co.* case. In the *Telephone* case, the allowance was approximately 3% above cost less depreciation; here it is roughly 17%. We cannot say that the Commission, the expert body to which the function of valuation for rate-making purposes is committed, was arbitrary in declining to make a larger allowance or that the result at which it arrived is confiscatory.

The special difficulties and problems of the City in serving consumers outside its own corporate limits and the possible burdens which may fall upon taxpayers within the City as a result of the county service are beyond our field of action. We may, however, note that this litigation does not present for our determination the correctness of the Commission's views with regard to the obligations which it thought flowed from the right conferred upon the City to supply water to persons outside the City limits, and we express no opinion thereon.

In accordance with our holdings as to the two points presented for review, the final order of the Circuit Court for Washington County is affirmed.

*Order affirmed, with costs.*